AIEA LANI CORP., Plaintiff-Appellee *v.* HAWAII ESCROW & TITLE INC., Defendant-Appellant

NO. 7717

(CIVIL NO. 53582)

JUNE 22, 1982

RICHARDSON, C.J., LUM, NAKAMURA, PADGETT & HAYASHI, JJ.

OPINION OF THE COURT BY HAYASHI, J.

This appeal is taken from the judgment of the Circuit Court of the First Circuit in favor of Plaintiff-Appellee Aiea Lani Corporation (hereinafter cited as appellee) in the amount of $6,774.

Appellee began development of a horizontal property regime located in Aiea known as Aiea Lani Estates (hereinafter cited as the development) in 1973. In connection with the development, Defendant-Appellant Hawaii Escrow and Title, Inc. (hereinafter cited as appellant), contacted appellee's president, Warren Ho, hoping to secure appellee's business. Appellant submitted three pro-

posals for appellee's consideration. The first provided for a standard rate of $6,799 for an ALTA construction loan title insurance policy[1] in the amount of $3,100,000.[2] The second provided for a straight discount of 60% off the standard rate. The third provided for an up-front charge of 110% of the standard rate and a credit upon the closing of the individual unit sales, of a prorated amount of 100% of the standard rate; appellee would, in effect, obtain its construction loan title insurance policy for 10% of the standard rate under the third proposal, the one which appellee eventually chose.

Appellant confirmed the agreement reached between appellee and itself in a letter dated November 20, 1973, which provided in pertinent part:

Pursuant to our verbal conversation of November 19, 1973, this is to confirm our Title Insurance fees.

For and in consideration of a cash advance of $7,498.90 (which represents 110% of the standard rate), payable within 30 days from the issuance of our ALTA Construction Loan Policy of $3,100,000. Our premium charge is $724.90, the balance of $6,774 owing you will be payable upon the closing of all the individual escrows for Aiea Lani Estates. This will reflect as a credit of $112.90 on the Sellers Closing Statement. In short,.your cost is $724.90 for the ALTA policy.

In addition, the letter provided that appellant would also be furnishing the buyers of the individual units with ALTA title insurance policies covering the separate units for which each buyer would be charged $175 per unit. Each buyer would also be responsible for an escrow fee of $75; appellant waived the escrow fee of $75 which was chargeable to appellee.

Pursuant to the agreement, appellee paid appellant $7,499.40[3] on or about October 11, 1974.

---

[1] An ALTA title insurance policy is a standardized policy used by members of the American Land Title Association.

[2] The amount of the policy was increased to $3,280,000 on or about October 11, 1974, but no adjustments were made in the fees agreed upon.

[3] When asked why he paid $7,499.40 rather than the $7,498.90 agreed upon, appellee's president said, "I really didn't pay that much attention because I thought it was close enough." (Tr. 34)

In approximately May or June of 1975, prior to the closing of any of the units, appellant became aware of the passage of the Real Estate Settlement Procedures Act of 1974 (Pub. L. 93-533), 12 U.S.C. §§ 2601 *et. seq.* (hereinafter cited as RESPA) which was to be effective as of June 20, 1975.[4]

RESPA provides, in pertinent part:

§ 2607. Prohibition against kickbacks and unearned fees.

### Business Referrals

(a) No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

### Splitting Charges

(b) No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.[5]

Believing that RESPA made the reimbursement to appellee illegal, appellant's representative testified that appellant immediately informed Warren Ho, appellee's president, of the situation. Mr. Ho, however, testified that he was not made aware of the possible applicability of RESPA until he made demand on appellee for the $6,774 after the closing of all the units. The trial court found Mr. Ho's testimony more credible.

Appellee sold forty-seven of the sixty units to individual purchasers.[6] Due to financial problems, appellee was unable to sell the remaining thirteen units and by agreement conveyed them, in August 1977, to the lending institution that provided appellee with its

---

[4] H.R. REP. NO. 94-667, 94th Cong., 1st Sess. 1, *reprinted in* [1975] U.S. CODE CONG. & AD NEWS 2448.

[5] 12 U.S.C. § 2607(a)(b) (1980).

[6] According to testimony of appellant's vice-president, the first units closed on August 29, 1975. (Tr. 58)

construction loan; the trial court ruled that the conveyance qualified as a closing of the units involved, as contemplated by the parties' agreement.

The trial court found that RESPA was not applicable to the transaction in the instant case and, thus, ruled that the contract was enforceable as contracted and appellant was required to reimburse $6,774 to appellee plus attorney fees pursuant to Hawaii Revised Statutes (HRS) § 607-14. For reasons discussed below, we reverse.

The issues before this court on appeal are whether the trial court erred in finding RESPA inapplicable, and if RESPA is applicable, what effect it has on the transaction herein.

The applicable standard in reviewing the trial court's findings of fact is set forth in Hawaii Rules of Civil Procedure (HRCP) Rule 52(a) which provides that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." A finding is clearly erroneous when the court is left with a "firm and definite conviction that a mistake has been committed." *Miller v. Leadership Housing Systems, Inc.,* 57 Haw. 321, 326, 555 P.2d 864, 868 (1976). *Honda v. Higa,* 52 Haw. 311, 474 P.2d 708 (1970); *Ed Klein, Inc. v. Hotel Kaimana, Inc.,* 51 Haw. 268, 457 P.2d 210 (1969); *Peine v. Murphy,* 46 Haw. 233, 377 P.2d 708 (1962). In applying this standard to the instant case, we believe that the lower court erred in finding RESPA inapplicable to the transaction involved in this case.

RESPA was enacted on December 22, 1974, as a remedial measure when Congress found that

significant reforms in the real estate settlement process [were] needed to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country.

12 U.S.C. § 2601(a). One of the stated purposes of the Real Estate Settlement Procedure Chapter was to effect changes in the settlement process for residential real estate that would result "in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." This objective is to be effectuated through 12 U.S.C. § 2607 — Prohibition Against

Kickbacks and Unearned Fees. The Secretary of Housing and Urban Development, authorized to prescribe rules and regulations and make interpretations as necessary to achieve the purposes of the chapter, formulated Regulation X which interpretes the provisions of RESPA. Thus, we have to look to Regulation X as well as the Act in determining whether RESPA is applicable to the transaction before us.

Initially, we note that the prohibitions in 12 U.S.C. § 2607 are triggered when a transaction involves both real estate "settlement services" *and* "a federally related mortgage loan." The term "settlement services" as defined "includes any services provided in connection with a real estate settlement including, but not limited to, the following: title searches, title examinations, the provision of title certificates, *title insurance . . . and the handling of the processing, and closing or settlement."* 12 U.S.C. § 2602(3) (emphasis added). There is no question that the transaction between appellant and appellee involved settlement services by definition; appellant was to provide appellee and the individual buyers with title insurance and was to process the individual closings.

There is question, however, as to whether a "federally related mortgage loan" as defined by 12 U.S.C. § 2602(1) was involved.

(1) the term "federally related mortgage loan" includes any loan (other than temporary financing such as a construction loan) which —

(A) is secured by a first lien on residential real property (including individual units of condominiums and cooperatives) designed principally for the occupancy of from one to four families; and

(B)(i) is made in whole or in part by any lender the deposits or accounts of which are insured by any agency of the Federal Government, or is made in whole or in part by any lender which is regulated by any agency of the Federal Government;

While the construction loan which appellee procured for the development is specifically exempt from the impact of RESPA,[7] the

---

[7] Regulation X delineates a number of exempt transactions, one of which is, "[A] construction loan, except where the construction loan is used as or converted to a permanent loan to finance purchase by the first user." 24 C.F.R. § 3500.5(d)(5).

loans which the individual buyers obtained to finance the purchase of their separate units qualify as federally related mortgage loans.

Regulation X clarifies § 2602(1) by setting forth four requirements which must be met for a loan to be considered a federally related mortgage loan; it provides in pertinent part:

(1) The proceeds of the loan are used in whole or in part to finance the purchase by the borrower, or other transfer of legal title of the Mortgaged Property . . . .

(2) The loan is secured by a first lien or other first security interest covering real estate, . . .

. . . .

(v) which is a condominium unit (or a first lien covering a cooperative unit) designed principally for the occupancy of from 1 to 4 families;

(3) The Mortgaged Property is located in a State; and

(4) The loan: (i) Is made by a *Lender meeting the requirements of paragraph (c)* below, . . . .

24 C.F.R. § 3500.5(b) (emphasis added). Paragraph "c" provides that:

A Lender is within paragraph (b) (4) (i) if it is:

(1) A lending institution the deposits or accounts of which are insured by the Federal Savings and Loan Corporation (FSLIC), the Federal Deposit Insurance Corporation (FDIC) or any other agency of the Federal Government.

24 C.F.R. § 3500.5(c). There was sufficient evidence in the record from which to determine that the majority of buyers did in fact go to qualifying lenders to secure financing to purchase their condominium unit.

According to Mr. Ho, appellee's president, both the construction loan and the individual loans were obtained through Liberty Bank.

A. Well, I think the make up was that San Francisco Ureka Financial had funded the loan and Liberty Bank would administer the loan.

Q. O.k. And which loan would this — was this the construction loan?

A. This was both the construction loan and the individual loans to the individual purchasers.

Q. O.k. And it was your understanding that Ureka Federal

644

Savings and Loan was the person that put up the money and Liberty Bank was more or less administering the funds?

A. That's correct.

Q. And Ureka Federal put up funds not only on the construction loan but put up funds for the individual mortgages of those people who financed through Liberty Bank, right?

A. That's right.

Mr. Salvatore Fanciullo, appellant's vice-president, testified that *most* of the individual buyers were financed either by Loyalty Mortgage Company or Liberty Bank.

Q. One other question. Would you be able to tell the court where the individual sales or correction — strike that. Would you be able to tell the court who financed the individual sales of the buyers?

A. Most of them, I can, yes.

Q. What would those be?

A. They were either between Loyalty Mortgage Company, Loyalty and or Liberty Bank, from my recollection.

While it is not clear from the testimony whether the individual purchasers obtained financing solely from Liberty Bank or from both Liberty Bank and Loyalty Mortgage Company, what is relevant to the issue of the applicability of RESPA is whether the lending institutions were insured by the Federal Government. Mr. Fanciullo testified that both institutions were so insured.

Q. All right. Do you know if either of those two outfits are insured by the Federal Government?

A. Yes, they are.

In fact, the lower court took judicial notice that Liberty Bank's funds were federally insured.

MR. GOULD: Federally insured funds that the bank — and the testimony uncorroborated that Liberty Bank is federally —

THE COURT: There's no question about that. The court takes judicial notice — knowledge of that.

From the preceding, it is apparent that the loans obtained by the individual purchasers fall within the definition of federally related mortgage loans and thus are subject to RESPA. However, appellee contends that the only loan involved in the transaction between appellee and appellant was the construction loan for which appellant was to provide an ALTA title insurance policy.

We disagree. RESPA prohibits any person from accepting or giving anything of value in consideration for referral of settlement service business "involving" a federally related mortgage loan. The term "involving" is a broad term which "possesses connotations such as 'implying,' 'including,' 'relating to,' 'growing out of,' '[necessitating] as a result or legal consequence.' " *Taub v. Bowles,* 149 F.2d 817 (Emer. Ct. App. 1945). *Feil v. Federal Trade Commission,* 285 F.2d 879 (9th Cir. 1960).

The record is replete with uncontroverted evidence that the agreement whereby appellant was to provide escrow services and title insurance policies to both appellee and the individual buyers was a package deal. As such, the federally related mortgage loans obtained by the individual buyers were involved in the transaction. Therefore, we hold that the trial court erred in finding that the transaction herein was not subject to RESPA.

Appellee further argues that even if RESPA is applicable, the reimbursement provision under the agreement does not violate RESPA's prohibition against kickbacks since appellee would not be receiving a fee, kickback, or thing of value[8] for *referring* settlement service business to appellant. We disagree.

Again, the evidence is uncontroverted that appellant was to provide both the title insurance policy for the construction loan and the title insurance policies for the individual units. According to the testimony of appellee's witness, the insurance policies for the construction loan and for the individual units are separate and distinct;

---

[8] If appellant reimbursed appellee $6,774, appellee would in effect have obtained its construction loan title insurance policy for $724.90, which amounts to 10% of the standard rate; appellee would be getting a 90% discount. Such a discount in insurance rates constitutes a "thing of value" under 12 U.S.C. 2607.

(b) *Thing of value.* "Things of value" is broadly defined by section 3(2) of RESPA [12 U.S.C.A. § 2602(2)] to include any payment, advance, fund, loan, service, or other consideration. Under section 8 of RESPA [12 U.S.C.A. § 2607], a thing of value may be provided either directly or indirectly to the person referring settlement business and can take many forms including, but not limited to, monies, things, *discounts,* salaries, commissions, fees, duplicate payments of a charge, stock dividends, distributions of partnership profits, credits representing monies that may be paid at a future date, special bank deposits or accounts, banking terms, special loan or loan guarantee terms, services of all types at a special or free rates, and sales or rentals at special prices or rates.

24 C.R.F.R. § 3500.14(b) (Emphasis added).

the former required by the developer's lender and the latter required by the individuals' lenders.[9]

The fact that appellant was to provide the policies for the individual units was mentioned in appellant's confirmation letter of November 20, 1973, wherein appellant wrote, "In connection with the premium charge for the ALTA policy covering the *individual units,* our fee will be $175 per unit." (Appellee's Exhibit 3) (Emphasis added). It was referred to again in appellant's letter of March 25, 1974: "We have discussed this with Mr. Marn and have no objection to cancelling the referenced Escrow Agreement provided we are still engaged for the purpose of issuing the *individual ALTA policies,* and the ALTA Construction Loan Policy in the amount of 3.1 million." (Appellee's Exhibit 5) (Emphasis added).

Although appellee may not have specifically stated that it would refer individual buyers to appellant for the purpose of obtaining title insurance for their individual units, this is clearly what was envisioned by the parties. Therefore, we hold that the trial court erred in finding that the reimbursement to appellee was not conditioned upon any agreement to refer business to appellant. The agreement between the parties in the instant case is similar to an example provided in 24 C.F.R. § 3500, App. B, illustrating situations which violate RESPA.

> Facts. A, a provider of settlement services, provides settlement services *at abnormally low rates* or at no charge at all to B, a builder, in connection with a subdivision being developed by B. B agrees to refer purchasers of the completed homes in the subdivision to A for the purchase of settlement services in connection with the sale of individual lots of B.
>
> Comments. The rendering of services by A to B at little or no charge constitutes a thing of value given by A to B in return for

---

[9] Testimony of Mr. Marn, former employee of appellant.

Q. All right. When you talk about rate schedule, you were talking about a rate that is charged to a purchaser?

A. In this case, to be two, we're talking. First of all, the construction loan for the project, before that can become to the ultimate purchasers. So, on that, like the multi-million loan, that's one. If the proposed project in the end gets sold to a prospective buyer, then that buyer has to go, if anything, to a lender, to secure mortgage for the purchase.

Then, another policy would be required for that particular lender.

the referral of settlement business and both A and B are in violation of Section 8 of RESPA. [Emphasis added.]

The agreement to reimburse appellee is subject to and illegal under RESPA. Thus, the contractual promise to reimburse was rendered impossible to perform by law. "As a general rule, a contractual duty is excused when government regulations make performance impossible." *R.C. Craig Ltd. v. Ships of Seas Inc.*, 345 F. Supp. 1066 (S.D. Ga. 1972). *Baird v. Wendt Enterprises, Inc.*, 248 Cal. App. 2d 52, 56 Cal. Rptr. 118 (1967); *Stein v. Bruce*, 366 S.W.2d 732 (Mo. 1963); *Ask Mr. Foster Travel Service, Inc. v. Tauck Tours, Inc.*, 181 Misc. 91, 43 N.Y.S.2d 674 (Sup. Ct. 1943); *Burkus v. Henshall*, 386 Pa. 478, 126 A.2d 722 (1956); *Takahashi v. Pepper Tank & Contracting Co.*, 58 Wyo. 330, 131 P.2d 339 (Wyo. 1942); RESTATEMENT (SECOND) OF CONTRACTS, § 261, 264 (1979). Accordingly, the judgment is reversed.

*Benjamin L. Carroll, III,* for defendant-appellant.

*Gary Lee (Dale W. Lee* on the brief), *Ukishima & Matsubara* of counsel, for plaintiff-appellee.