**TRAVELERS INSURANCE COMPANY; Fearless, Inc.; T/A Mama's Fish House; Brent Jones, Plaintiffs–Appellants,**

v.

**BUDGET RENT–A–CAR SYSTEMS, INC., Defendant–Appellee.**

No. 88–15400.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 31, 1989.

Decided April 18, 1990.

Randall Y.S. Chung and Kevin P.H. Sumida, Honolulu, Hawaii, for plaintiffs-appellants.

Steven K. Hisaka, Hisaka, Furusho, Ayabe & Goto, Honolulu, Hawaii, for defendant-appellee.

Before SNEED, KOZINSKI and THOMPSON, Circuit Judges.

KOZINSKI, Circuit Judge:

Once again, we consider whether a contract is an instrument by which parties can define their rights and responsibilities by mutual agreement, or a platform for judicial policymaking. We address this question in a diversity case involving a rental car agreement that excludes insurance coverage for unauthorized drivers, where the unauthorized driver in question was a parking valet.

## Facts

The facts are not in dispute. In October 1985, while vacationing on the island of Maui in Hawaii, Albert Mellon rented a car from Budget Rent–A–Car. The rental agreement stated that Budget would provide liability insurance for Mellon and any other authorized driver. Budget was self-insured.

Several days after renting the car, Mellon and his wife drove to Mama's Fish House, a local restaurant of some renown. On arrival, Mellon turned the rental car over to Brent Jones, a valet parker in Mama's employ. The Mellons partook of piscine fare; Mr. Mellon had the mahi-mahi, Mrs. Mellon the shrimp.

After a satisfying dinner, Mellon dispatched Jones to retrieve the car. Jones drove the car to the restaurant entrance, where—while still seated behind the wheel—he opened the passenger side door for Mrs. Mellon. As Mrs. Mellon stood beside the open door, Jones got out of the car. The car lurched backward. The open door struck Mrs. Mellon, dragged her along the ground and caused numerous injuries.

The Mellons filed suit against Mama's and Jones. That suit was settled when Travelers Insurance, Mama's insurer, tendered its full policy limit of $300,000. Budget, as owner and insurer of the car that struck Mrs. Mellon, also paid her $15,000 pursuant to Hawaii's no-fault insurance statute. Travelers then instituted the present suit seeking a declaration that Budget must also indemnify Travelers for half of the expenses of defending Mama's and Jones and up to $100,000 of the settlement. Travelers' claim is derived from its insured, Jones, who, it argues, was also insured by Budget because he used the car with Mellon's permission.

Following discovery, Travelers and Budget both moved for summary judgment. The district court held that, because Jones did not have Budget's permission to drive the car, he was not insured by Budget. Consequently, the court granted summary judgment in Budget's favor.

Travelers appeals. We review the district court's grant of summary judgment de novo. *State Farm Fire & Casualty Co. v. Martin*, 872 F.2d 319, 320 (9th Cir.1989).

## Discussion

Travelers points to two sources from which Budget's liability might derive: the rental agreement between Budget and Mellon, and Hawaii Revised Statutes (HRS) § 287–25.

### A. The Rental Agreement

To allow Travelers to recover from Budget on the basis of the rental agreement would require an act of interpretive legerdemain; the language of the contract could not be clearer. The rental agreement provides liability coverage "only for Renter and any Authorized Driver ... for bodily injury ... arising from use or operation of Vehicle as permitted by this Agreement." As to what is permitted by the agreement, it states explicitly that the

> Vehicle shall not, under any circumstances, be used or operated by any person: (a) Other than Renter or any Authorized Driver which shall by definition include only the Additional Driver shown on the reverse side hereof, and any driver who is a member of Renter's immediate family, his employer, his employee, his fellow employee, or his partner, provided such driver has Renter's prior permission and is a qualified, licensed driver of at least 21 years of age; ....

Brent Jones is neither the Renter nor an Authorized Driver as provided by the rental agreement. Under the plain terms of the contract, Budget provides no coverage for the accident at Mama's Fish House.

Travelers would have us adopt a different interpretation; it makes two arguments in this regard.[1]

1. Travelers relies on *BATS, Inc. v. Shikuma*, 1 Hawaii App. 231, 617 P.2d 575 (1980), for the proposition that Mellon was still "using" the car within the meaning of the contract when he turned it over to the valet. In *BATS*, a rental car insurance policy limited coverage to instances where the car was being "operated or used" by the named insured. The court distinguished "operation," meaning the actual driving of the car, from "use," meaning under one's supervision and control even if driven by another. Thus, *BATS* held that the insured was "using" the car under the terms of the agreement when he gave it to a friend to return to the rental company. 617 P.2d at 576–78.

*BATS* does not help Travelers here. The rental agreement in *BATS* was inclusive; it insured any operation or use by the renter. Although the renter was not operating the car, he was using it, under the court's definition, and the rental agreement thereby provided liability coverage. By contrast, the rental agreement here is exclusive; it provides that the car "shall not, under any circumstances, be used or operated by any person" other than the renter or an authorized driver. It further states that Budget will provide liability coverage only for use or operation "permitted by this Agreement." Even if Mellon was still "using" the car while the valet had it, he was not using it as permitted by the agreement; for whoever was "using" the car, there is no doubt that the valet, an unauthorized driver, was "operating" it. Mellon thereby violated the agreement, and there is no coverage.

[redacted] 2. Travelers next asks us to read into the rental agreement an implied term providing liability coverage to anyone who drove the car with Mellon's permission. The company points to cases from other jurisdictions that have found such an implied term. See, for example, *Allstate Insurance Co. v. Travelers Insurance Co.*, 49 A.D.2d 613, 370 N.Y.S.2d 675 (1975); *Financial Indemnity Co. v. Hertz Corp.*, 226 Cal.App.2d 689, 38 Cal.Rptr. 249 (1964); *Roth v. Old Republic Insurance Co.*, 269 So.2d 3 (Fla.1972). We find these cases unpersuasive and, for the reasons set forth below, we do not believe the Hawaii Supreme Court would follow them.

For one thing, an implied term providing liability coverage to anyone other than the renter or an authorized driver would be directly contrary to the express language of the contract. It is elementary contract law that a court will only supply a term where the contract does not address the dispute between the parties. *In re Marriage of Garrity/Bishton*, 181 Cal.App.3d 675, 683, 226 Cal.Rptr. 485 (1986) ("[T]here can be no implied covenant where the subject is completely covered by the contract.") and cases cited therein; E. Allan Farnsworth, *Contracts* § 7.16 at 521 (Little, Brown, 1982) ("[A] court will supply a term only after it has determined that the language of the agreement does not cover the case at hand."). Where the language of a contract is clear and addresses the issue before the court, the court may not interpret the contract by supplying an implied term:

> When the terms of a contract are definite and unambiguous there is no room for interpretation. It is only when the language used by the parties leaves some doubt as to the meaning and intention that the courts will apply the rules of construction and interpretation in an effort to ascertain the intention of the parties to the contract.

*Hackfeld and Co. v. Grossman*, 13 Hawaii 725, 729 (1902), quoted in *DiTullio v. Hawaiian Insurance & Guaranty Co.*, 1 Hawaii App. 149, 616 P.2d 221, 226 (1980), and *Hanagami v. China Airlines, Ltd.*, 67 Hawaii 357, 688 P.2d 1139, 1144–45 (1984).

1. On appeal, Travelers also contends that the use restriction in the Budget–Mellon agreement is void because the print is too small, and therefore violates HRS § 431:10–104 concerning the readability of insurance contracts. As this argument was not raised below, we will not address it here. See *Singleton v. Wulff*, 428 U.S. 106, 120–21, 96 S.Ct. 2868, 2877–78, 49 L.Ed.2d 826 (1976).

The Budget–Mellon rental agreement is definite and unambiguous on this point; the contract excludes insurance coverage for the events at Mama's parking lot. There is no occasion to supply an implied term, and that should be the end of the matter as far as Hawaii contract law is concerned.

Travelers nonetheless points to cases from other jurisdictions that have found an implied permittee term under circumstances similar to those here. According to these courts, car rental companies must expect that some renters will allow other people to drive the rental car in violation of the agreement. Therefore, the rental companies are deemed to have consented to the breach. See, for example, *Allstate*, 370 N.Y.S.2d at 677 ("*[I]t is* foreseeable and inevitable that rental vehicles will be involved in their fair share of accidents, and that some of them will be operated in violation of a restrictive lease agreement.") (emphasis original);[2] *Financial Indemnity*, 226 Cal.App.2d at 699, 38 Cal.Rptr. 249 ("Hertz did not have a reasonable basis for believing that *the said restriction contained* in the referred to Hertz contract would be carried out; and since Hertz had no such reasonable expectations, Hertz is deemed to have given implied permission to the use of the subject automobile without the said restriction.").

To recite such reasoning is to criticize it. The idea that a party may not rely on a contract term because the other side can be expected to violate it cuts at the very heart of contract law. Contracts enable parties to define their mutual rights and responsibilities; they are useful only insofar as each side can count on being able to hold the other to the terms of the agreement.

If a contract provides anything at all, then, it is the reasonable expectation that the parties will fulfill their obligations, either voluntarily or under judicial compulsion. For a court to deny enforcement of a contract term because breach is foreseeable defeats the purpose of having a contract, effectively withdrawing that particular issue from regulation by mutual assent.[3]

The dangers of the *Allstate/Financial Indemnity* approach are manifold. In the first place, it forces a wealth transfer from those who respect the terms of their agreements to those who do not. When courts take away the right of the parties to limit who will drive the rental car, they confer a benefit on the plaintiffs before them as well as on all others similarly situated. But these benefits do not appear as manna from heaven; like all other economic advantages, someone has to pay for them. Under these circumstances, insurance companies foot the bill, but only until they can raise their rates to cover the additional risk. Automobile renters thus wind up paying for the implied permittee term whether they want it or not; those who respect the terms of their contract wind up subsidizing the renegers. As is often the case with judicially created rules that adjust contract rights on an ad hoc basis, an implied permittee term favors the careless, the irresponsible, the crafty, the unscrupulous at the expense of those who live up to their contractual responsibilities.[4]

The rule Travelers advocates is also dangerous because it adds a heaping measure of uncertainty where certainty is essential. Insurance companies, like other commercial actors, need predictability; they write their contracts in precise language for that reason, and they calculate their premiums accordingly. When insurance contracts no

---

**2.** The losing party in *Allstate* was Travelers Insurance Co.; having seen the light, Travelers now presses *Allstate* as a model for us to follow.

**3.** There are, of course, matters about which parties may not contract, such as where the contract contemplates illegal behavior or would violate some other strong public policy. See, for example, *Aiea Lani Corp. v. Hawaii Escrow & Title, Inc.*, 64 Hawaii 638, 647 P.2d 257, 263 (1982); *Wilson v. Kealakekua Ranch, Ltd.*, 57 Hawaii 124, 551 P.2d 525, 528 (1976). Indeed,

Travelers argues that HRS § 287–25 outlaws the kind of use restriction contained in the Budget–Mellon agreement. We consider this argument below. We are concerned here only with Travelers' proffered contract interpretation.

**4.** Often, rules that courts devise to prevent oppression become tools of fraud and obfuscation in the hands of those with incentive to avoid their contractual responsibilities. For an example, see *Ryan v. Loui (In re Corey)*, 892 F.2d 829, 838 n. 6 (9th Cir.1989).

longer mean what they say, it becomes exceedingly difficult to calculate risks. Insurance companies can predict with a fair degree of accuracy the risks involved when a car "may only be used or operated by an Authorized Driver." What are they to make of "it is foreseeable and inevitable that rental vehicles ... will be operated in violation of a restrictive lease agreement"? Just how many other risks will some court find foreseeable and inevitable? Increasing uncertainty through judicial meddling raises insurers' costs of doing business; inevitably, those costs are passed on to customers.

But perhaps the greatest danger in the facile reasoning of cases like *Allstate* and *Financial Indemnity* is its limitless scope. Breach of contract is always an option for a party to a commercial agreement, provided it is willing to bear the consequences. As a matter of experience, breach is a relatively common occurrence in the marketplace: Apartment dwellers occasionally move out before their lease expires; debtors often are unwilling or unable to repay as provided in the loan agreement; employers and employees sometimes terminate their relationships prematurely; buyers and sellers of real estate now and then refuse to go through with the deal. It is therefore "foreseeable and inevitable," to quote *Allstate*, that a significant portion of all contracts will be violated. Applying the rationale of *Allstate* and *Financial Indemnity*, one would have to conclude that virtually all commercial agreements are unenforceable because the contracting parties will be deemed to have consented to every "foreseeable and inevitable" breach.

This is total nonsense, of course; no court would take the reasoning of these cases to its logical conclusion. Yet there is nothing in principle that distinguishes *Allstate* and *Financial Indemnity* from the examples we have given; it all turns on the gut feeling of the judge who happens to be applying the law. Cases like *Allstate* and

*Financial Indemnity* are particularly pernicious, therefore, because they give courts a roving commission to nullify or rewrite contract terms they don't like, and to do so without bothering to rely on established principles of contract law. We are convinced that the Supreme Court of Hawaii would summarily reject a rule of law that gives courts such broad and undefined powers to rewrite agreements between parties who have dealt with each other freely and at arms length.[5]

B. Section 287–25

■ Travelers argues that the Hawaii legislature has created an exception to ordinary contract principles, applicable to this case. At least, the company says, we should interpret Hawaii Revised Statutes § 287–25 as having done so. That statute reads in relevant part:

> An owner's policy of liability insurance:
>
> .    .    .    .    .
>
> (2) Shall insure the person named therein and any other person, as insured, using any such motor vehicle ... with the express or implied permission of the named insured....

As the parties agree, in this case Budget is both the owner of the rental car and the named insured. Therefore, section 287–25 mandates coverage for the accident at Mama's only if Brent Jones had *Budget*'s express or implied permission to drive the car. By the terms of the Budget–Mellon agreement, Jones did not have express permission to use the car; indeed, he was expressly forbidden from using it. Jones could not have had implied permission either; in ordinary English, as we understand it, one who is expressly forbidden from doing something cannot at the same time have implied permission to do that thing.

Travelers nonetheless argues for a very different interpretation of "permission."

---

5. The Hawaii Supreme Court would not be alone in refusing to adopt the implied permittee rule. Many courts, under circumstances similar to these, have enforced rental car insurance agreements by their terms. See *Liberty Mutual Insurance Co. v. Edwards*, 294 S.C. 368, 364 S.E.2d 750, 751 (1988) (no insurance coverage under rental agreement for unauthorized driver operating car with permission of renter); *Whittaker v. Royal Globe Insurance Co.*, 124 N.H. 300, 471 A.2d 1149, 1151 (1983) (same); *Liberty Mutual Insurance Co. v. Mueller*, 570 F.2d 508, 509 (4th Cir.1978) (same, applying Virginia law).

The company contends that the Hawaii Supreme Court would now adopt the "initial permission" rule, under which section 287–25 would extend coverage to all subsequent permissive users of a car once the named insured had given permission to the initial user. See, for example, *Milbank Mutual Insurance Co. v. United States Fidelity & Guaranty Co.*, 332 N.W.2d 160, 162 (Minn. 1983).

Travelers' argument falls short under existing Hawaii law. In *Columbia Casualty Co. v. Hoohuli*, 50 Hawaii 212, 437 P.2d 99 (1968), the Supreme Court of Hawaii considered carefully the meaning of "permission" in the similarly-worded predecessor statute to section 287–25. The court discussed three rules adopted by other jurisdictions: (1) a strict rule, under which there is coverage only for those uses for which permission actually has been given; (2) the minor deviation rule, whereby a permittee is covered if the use at the time of the accident is no more than a slight deviation from the permission actually given; and (3) the initial permission rule. 437 P.2d at 103.

The court rejected all of these standards in favor of an interpretation it described as broader than the minor deviation rule, but not as broad as the initial permission rule. *Id.* at 105. Under *Columbia Casualty*, initial permission creates a presumption that the use to which the vehicle was put was within the scope of that consent. The presumption may be overcome, however, by "evidence establishing that consent had been expressly withdrawn prior to the actual use." *Id.* Here there is no dispute that Budget expressly withdrew its consent to have anyone other than Mellon or another authorized driver operate the car. If *Columbia Casualty* is still the law in Hawaii, Travelers loses.

Travelers contends that the Hawaii Supreme Court would now adopt the initial permission rule. Under that rule, Brent Jones would be entitled to insurance coverage from Budget, since he used the car incident to Budget's initial consent to Mellon. Travelers points to the following language in *Columbia Casualty* to support their position:

The legislature has not enacted a mandatory insurance statute although it has enacted a comprehensive financial responsibility act. A more extreme rule might be justified if the legislature were to enact a mandatory insurance law.

Id. at 105 n. 4 (citations omitted). Since that time, the Hawaii legislature has indeed enacted a mandatory insurance statute. See HRS §§ 431:10C et seq. (1988). This, Travelers argues, indicates that Hawaii now has even a stronger policy favoring insurance coverage for all automobile accidents, justifying a broader rule than that adopted in *Columbia Casualty*.

We are not convinced. In *Columbia Casualty*, the Hawaii Supreme Court engaged in a careful balancing of policy considerations that would not be substantially altered because Hawaii now requires auto insurance. This conclusion is bolstered by an examination of Hawaii's mandatory insurance law. Application of the initial permission rule under the facts of this case would not advance any legitimate policy of the state of Hawaii.

1. *Columbia Casualty* rejected the initial permission rule in part because of the uncertainty it would create. Such a rule, the court explained, "infringes on the insurer's right to select its risks. The [rule] shifts to the named insured the right to select additional insureds which the insurer might have declined to cover." 437 P.2d at 104. We have already discussed the overriding importance of certainty in the insurance context; the Hawaii Supreme Court in *Columbia Casualty* obviously shared those concerns. The importance of certainty is not diminished because Hawaii now requires all car owners to carry insurance.

In opposition to this certainty concern, the court considered the strong public policy favoring compensation of "the named insured, the permittee who may be uninsured otherwise, and the innocent party injured by an otherwise uninsured permittee." Id. After weighing these factors, the court struck the balance in favor of a rule less expansive than the initial permission rule.

While the Hawaii Supreme Court in *Columbia Casualty* suggested that enact-

ment of a mandatory insurance law might tip the scales in favor of a more expansive rule, we do not believe it would adopt such a rule in this case. Any generalized policy favoring compensation that one might derive from the existence of mandatory insurance in Hawaii does not favor Travelers here. Travelers is not and does not represent "the named insured, the permittee who may be uninsured otherwise, [or] the innocent party injured by an otherwise uninsured permittee." Travelers represents the tortfeasor. The injured party has already been compensated; and the named insured and its permittees are not complaining. Thus, we see no legitimate policy that would be furthered by providing coverage to Jones and Mama's. At the same time, the *Columbia Casualty* court's concern with certainty in insurance contracts weighs equally here as there.

2. The Hawaii mandatory insurance law, by its nature, disfavors Travelers' position. The law mandates no-fault insurance coverage; it is intended to eliminate tort liability in the vast majority of auto accidents. See HRS §§ 431:10C–102, 431:10C–306. All automobile owners must carry insurance that will be used to compensate victims for any personal injury caused by the owner's car, regardless of fault, up to a maximum determined by the state insurance commissioner. HRS § 431:10C–308. A victim who claims injury in excess of the statutory maximum may sue in tort. HRS § 431:10C–306(b)(2).

Here, Budget, as owner and insurer of the car, paid to Mrs. Mellon the maximum required under Hawaii no-fault law. This amount was insufficient to compensate Mrs. Mellon for her injuries. She sued Brent Jones and Mama's, the tortfeasors. The tortfeasors' insurance company, Travelers, paid her claim. We can't agree that the Hawaii no-fault statute evinces a policy favoring indemnification of Travelers by Budget. The no-fault statute places a cap on no-fault liability by limiting the liability of nontortfeasors. Excess damages are to be recovered from parties at fault. To hold Budget liable in excess of the no-fault maximum for money paid out by the tortfeasor would undermine the statute, which delegates the responsibility for excess damages to the tortfeasor. Rather than supporting adoption of the initial permission rule, Hawaii's no-fault statute actually reflects a public policy that weighs against it.

### Conclusion

Insurance companies and other institutional litigants are frequently heard to complain that courts undermine commercial transactions by refusing to apply contract terms as the parties agreed to them. As often as not, however, courts adopt these positions at the urging of these very litigants, who, for one reason or other, find it in their short-run interest to press such arguments. See, for example, *Allstate, Financial Indemnity,* supra p. 767. While parties are free to argue in good faith whatever position they deem advantageous in a particular case, we doubt that such a myopic litigation strategy contributes to the healthy development of the law or serves the long-term interest of those whose livelihood depends upon certainty and predictability in the enforcement of commercial contracts.

In any event, we find Travelers' arguments here unpersuasive. We believe the Hawaii Supreme Court would stand by the policies adopted in *Columbia Casualty* and deny Travelers recovery under these circumstances. If the Hawaii legislature wishes to create an exception to basic contract law in cases such as this, it is within their power to do so. They have not done so; we will not do it for them. When courts embark upon the uncharted waters of policy exceptions, they risk losing the compass that clear language provides.

AFFIRMED.

SNEED, Circuit Judge, concurring separately:

I concur in Judge Kozinski's thoughtful and comprehensive opinion. At a time when "authority" is a preferred source of rights and duties in this nation, it is good to read that "contract" is also a proper source of rights and duties. Judge Kozinski properly decries the transmutation of "contract" to "authority" by courts committed to redistributing wealth as between the parties and their attorneys.

On the other hand, it must be recognized that "authority" sometimes wears the mask of "contract." A relationship in which the "consent" of one party is coerced rests not on "contract" but, to the extent it is enforceable by law, on "authority." Courts frequently go astray by finding "coercion" when only inattention and convenience produced a "bad bargain" for a party. Too often do judges seek to protect the foolish from their folly. On the other hand, not all documents purporting to be contracts embody consent determined either subjectively or objectively. Parties should be bound by their words so long as, and only so long as, the words are theirs.

In this case there can be little doubt but that the words are those of the parties. Moreover, there exists no valid reason to excuse performance of the promises these words embody. Under these circumstances, to deny enforcement would be to reject "contract" as a source of obligations and entitlements and, as a consequence, to reduce the freedom of all.