**WILSON ARLINGTON COMPANY; Selden Ring; Irving Axelrad, Plaintiffs–Appellants,**

v.

**PRUDENTIAL INSURANCE COMPANY OF AMERICA, Defendant–Appellee.**

No. 88–6273.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 2, 1990.

Decided Aug. 27, 1990.

---

Hillel Chodos, Gina Putkoski, Los Angeles, Cal., for plaintiffs-appellants.

Kenneth B. Bley, Cox, Castle & Nicholson, Los Angeles, Cal., for defendant-appellee.

Before NELSON, BRUNETTI and KOZINSKI, Circuit Judges.

KOZINSKI, Circuit Judge:

The answer to the question presented in this appeal is, yes, Virginia, there *is* a parol evidence rule.

I

In early 1984, Prudential put up for sale one of its hotel properties—the Arlington Hyatt Hotel located in Arlington, Virginia. Prudential circulated a limited number of informational brochures describing the property and offering it for $26.5 million. Selden Ring, a partner in Wilson Arlington, responded to one of the brochures with an offer to purchase, which he submitted to Prudential on August 15, 1984. The offer met Prudential's asking price and provided that income and expenses from the hotel's operations were to be prorated between Prudential and Wilson Arlington as of the date of the closing of escrow.

During the next four and a half months, the parties engaged in extensive negotiations on a number of deal points, including price, warranties and terms of escrow. On January 4, 1985, they signed a twenty-seven page "Sale Agreement" prepared by Prudential's in-house counsel. The Sale Agreement provided for the transfer of all of Prudential's interest in the hotel property to Wilson Arlington for $25.95 million. The parties also signed various other documents, including one titled "Assignment and Assumption of Management Agreement," which transferred to Wilson Arlington all of Prudential's rights and obligations under a management contract with the Hyatt Corporation (the Management Agreement). All of the documents were incorporated by reference into the Sale Agreement.

Escrow closed on March 26, 1985. Soon thereafter, Wilson Arlington made a demand on Prudential for reimbursement of expenses incurred in operating the hotel prior to closing. Prudential refused and instead made a claim against Wilson Arlington for monies the latter had collected as receivables from pre-closing hotel operations and for the hotel's cash on hand at the time of closing.

Because the parties were unable to resolve their differences, Wilson Arlington filed an action in the California Superior Court to recover approximately $300,000 from Prudential as reimbursement for the pre-closing accounts payable. Prudential removed the action to federal court pursuant to 28 U.S.C. § 1332, where it counterclaimed against Wilson Arlington and its

general partners, Selden Ring and Irving Axelrad, for approximately $600,000, consisting of the hotel's cash on hand and accounts receivable generated by pre-closing operations.

Wilson Arlington moved for summary judgment on all claims. The district court granted Wilson Arlington's motion as to the reimbursement of the accounts payable, but denied its other motions. The case proceeded to trial, and the jury found for Prudential on its counterclaim, awarding it $609,522 plus costs and interest.[1] Wilson Arlington appeals; Prudential does not cross-appeal the entry of partial summary judgment against it as to the $300,000 in pre-closing accounts payable.

## II

■ Wilson Arlington contends that the district court erred in denying its motions for summary judgment, as the plain language of the Sale Agreement and the Management Agreement entitled it to the pre-closing accounts receivable and cash on hand.[2] Prudential, however, claims that these documents are not clear, that they do not embody the entire agreement between Prudential and Wilson Arlington, and that sufficient parol evidence exists supplementing and contradicting the language of the documents so as to raise a material issue of fact as to the parties' rights to the funds at issue. To resolve this dispute, we must determine when parol evidence is admissible under the law of Virginia to aid a court in interpreting a written agreement. First, however, we take a closer look at the documents governing the parties' rights.

A. The Sale Agreement requires Prudential to convey to Wilson Arlington the Arlington Hyatt Hotel's "Property" on the date of the closing of escrow, March 26, 1985.[3] Section 5 of the agreement provides for the proration between Prudential and Wilson Arlington of a number of the hotel's expense and income accounts as of the closing date, including utility bills, accounts payable and rent due from Elson's News and Gift Shops, Inc., a concessionaire in the hotel. ER at 74–77. The Sale Agreement does not, however, explicitly assign rights to the cash on hand or pre-closing accounts receivable to either party, other than those accounts mentioned in section 5. The allocation of these funds is instead governed by the Hyatt Management Agreement, which the Sale Agreement incorporates within its definition of the hotel's "Property."[4] Perhaps as an extra measure of caution, Prudential also assigned to Wilson Arlington all its rights and obligations under the Management Agreement in a sepa-

---

1. After calculating pre-judgment interest on the amount awarded, the district court subtracted the amount due from Prudential to Wilson Arlington as reimbursement for pre-closing accounts payable, including interest, and added costs, entering a net judgment in favor of Prudential for $380,471.15.

2. Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

3. The closing date was originally set for no later than January 31, 1985, ER at 68, but was delayed with the written consent of both parties. ER at 114, 117.

4. The Sale Agreement provides that Prudential convey to Wilson Arlington all of the Arlington Hyatt Hotel's "Property" on the date of closing. "Property," as defined in the Agreement, in-

cludes "the Land, the Site Improvements, the Building, and the Other Seller Interests" in the hotel. ER at 70. "Other Seller Interests" includes, inter alia, all of Prudential's

> right, title and interest ... in and to the Property or pertaining thereto, and all hereditaments and appurtenances thereunto belonging or in anywise appertaining, including, without limitation:
> ....
> (d) [Prudential's] right, title and interest ... in and to any contracts, instruments and other intangible property relating to or affecting the use or operation of the Property which [Wilson Arlington] wishes to assume, including without limitation, the service, maintenance, labor and similar agreements set forth on Exhibit C annexed hereto and made a part hereof.

ER at 69–70.

The contracts identified in Exhibit C include the *Management Agreement*. Thus, the Management Agreement clearly is binding on Prudential and Wilson Arlington via the Sale Agreement.

rate document. *See* Assignment and Assumption of Management Agreement, ER at 164–66.

Under the Management Agreement, the Hyatt Corporation is responsible for the day-to-day operations of the hotel, including the renting of rooms and concession space. It is also responsible for the collection of rents "and other sums" from concessionaires and guests. ER at 177. Section 3.3 of the Agreement obligates Hyatt to maintain bank accounts—the "operating accounts"—in trust for the hotel's owner and to deposit into that account "all moneys received by Hyatt from the operations of the Hotel." ER at 178. Hyatt is authorized to use the operating accounts to pay the hotel's operating expenses, pay itself a management fee and to put aside a reserve for working capital. After monthly expenses and management fees have been deducted, "Hyatt shall remit to Owner out of the operating accounts the amount" of income that exceeds what is necessary to maintain the required level of working capital. ER at 184.

As the identity of the Owner changed as of the closing date, Hyatt thereafter began remitting these amounts, known as Owner's Remittance Amounts, ER at 184–85, to Wilson Arlington. Because neither the Sale Agreement nor the Management Agreement contained a proration clause pertaining to the calculation of the Owner's Remittance Amount, the remittances to Wilson Arlington after the closing date necessarily reflected cash on hand at the time of closing, plus amounts collected after the closing date on account of pre-closing receivables. It is these two items to which Prudential now lays claim.

B. While the path we are required to follow in construing the various documents is somewhat tortuous—involving two sepa-rate agreements and a number of clauses and definitions—it is nevertheless a clear one. It is impossible to read the two documents together with this question in mind and reach a conclusion other than that Wilson Arlington is entitled to all Owner's Remittance Amounts due under the Management Agreement as of the date of closing. While the parties were careful to provide for prorations with respect to other contracts the buyer would be assuming, such as rental agreements with the hotel's concessionaires, *see* p. 368 *supra*, they omitted any reference to proration of the amounts due under the Management Agreement. Looking at the language of the relevant contracts, therefore, it would appear Wilson Arlington was entitled to prevail—indeed, prevail on summary judgment.

Wilson Arlington did move for summary judgment. It lost, however, because the district court concluded that Prudential had raised a material issue of fact by presenting affidavits from its lawyers to the effect that cash on hand on the closing date would belong to the seller, as would any amounts received on account of the pre-closing receivables. *See* CR at 25, Affidavits in Opposition to Motion for Summary Judgment. Which brings us to the question raised by this appeal: Does Virginia law, which the parties agree governs this dispute, permit a party to present parol evidence to contradict or modify the terms of an integrated agreement? [5]

1. There was a time, not all that long ago, when parties to a commercial transaction could rely on a simple maxim—a clear contractual term means what it says. Based on the notion that words can be used to convey a clear meaning, this principle formed the underpinnings of the parol evi-

---

5. While the transaction involved multiple documents, they were carefully cross-referenced and incorporated in the Sale Agreement, then neatly tied up with a standard integration clause:

This Agreement contains the entire agreement between the parties and any and all prior understandings and dealings heretofore had are merged herein and any modification, revision or agreement hereafter made shall be ineffective to change, modify, or discharge this Agreement in whole or in part unless such agreement hereafter made is in writing and signed by the parties hereto.

Sale Agreement, Section 19.4, ER at 90. Section 19.1 further provides that the "Agreement may not be changed or terminated orally." ER at 89. Thus, on its face, the agreement does not permit the introduction of extrinsic evidence to contradict or modify its terms.

dence rule that made extrinsic evidence inadmissible to interpret, vary or add to the terms of an unambiguous written instrument. *See Trident Center v. Connecticut General Life Ins. Co.*, 847 F.2d 564, 568–69 (9th Cir.1988). The policy supporting strict enforcement of this rule was clear: If parties to an agreement could not rely on written words to express their consent to the express terms of that agreement, those words would become little more than sideshows in a circus of self-serving declaration as to what the parties to the agreement really had in mind. The parol evidence rule thus enables parties to rely on written instruments as embodying a complete memorial of their agreement, and to avoid costly and disruptive litigation over the existence of oral and implied terms that may or may not have been contemplated by the parties.

Notwithstanding the importance of its function, the parol evidence rule has been severely eroded in many jurisdictions during the past few decades. *See, e.g., Admiral Builders Sav. & Loan Assoc. v. South River Landing, Inc.*, 66 Md.App. 124, 502 A.2d 1096, 1098–1100 (1986); *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 682 P.2d 388, 398–99 (1984); *Bryan v. Vaughn*, 579 S.W.2d 177, 181–82 (Mo.App.1979); *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 442 P.2d 641, 69 Cal.Rptr. 561 (1968); *but see Amos v. Coffey*, 228 Va. 88, 320 S.E.2d 335 (1984) (retaining a strict application of the parol evidence rule). Often, this erosion has been so complete as to render the parol evidence rule essentially meaningless in ensuring the binding power of the written word. For example, in *Pacific Gas & Electric* the California Supreme Court, without expressly abolishing the parol evidence rule, cut the life out of it by permitting the introduction of extrinsic evidence to demonstrate the existence of an ambiguity even when the language of a contract is perfectly clear. Thus, even in a case such as this, where the contract was negotiated and drafted with the aid of counsel, and where the parties are sophisticated businesses engaged in a multi-million dollar real estate venture, the contract's plain language may be challenged as not manifesting the deal that was actually made. *Trident Center*, 847 F.2d at 569. Were we to apply California law to this case, we would no doubt be required to affirm the denial of Wilson Arlington's motion for summary judgment.

But this isn't California; it's Virginia.[6]

■ 2. "The rule which excludes parol evidence when offered to vary the terms and conditions of an integrated written contract has nowhere been more strictly adhered to in its integrity than in Virginia." *Pulaski Nat'l Bank v. Harrell*, 203 Va. 227, 123 S.E.2d 382, 387 (1962). Virginia continues to apply the "plain meaning" rule, construing the terms of a contract or conveyance in accordance with their common usage. *Amos*, 320 S.E.2d at 337; *Berry v. Klinger*, 225 Va. 201, 300 S.E.2d 792, 796 (1983). Where parties have reduced their agreement to a writing which imposes a legal obligation in clear and explicit terms, the writing shall be the sole memorial of that agreement, *Amos*, 320 S.E.2d at 337; *Pulaski*, 123 S.E.2d at 387, and parol evidence of prior or contemporaneous oral negotiations or stipulations is inadmissible to vary, contradict, add to or explain the terms of the agreement. *Anden Group v. Leesburg Joint Venture*, 237 Va. 453, 377 S.E.2d 452, 455 (1989); *Cohan v. Thurston*, 223 Va. 523, 292 S.E.2d 45, 46 (1982).[7]

In response to these repeated and unequivocal expressions from the Virginia courts indicating that parol evidence will *not* be admitted under these circumstances, Prudential cites a series of cases that stand for the unremarkable proposition that parol evidence is admissible in certain, limited

---

**6.** In *Trident Center*, we criticized *Pacific Gas & Electric* as "cast[ing] a long shadow of uncertainty over all transactions negotiated and executed under the law" of California. 847 F.2d at 569. This shadow, nevertheless, is not so long as to reach all the way into Virginia.

**7.** The rule in Virginia may be expressed as follows:

> A pledge is a pledge; a pact is a pact; a promise is a promise; and a fact is a fact....

G. Clinton & S. Landrum, "She's Mine," in *That Other Woman's Child* (1982).

circumstances, such as to show fraud, mutual mistake or to explain ambiguous contractual language. *See, e.g., Shevel's, Inc. —Chesterfield v. Southeastern Assoc.*, 228 Va. 175, 320 S.E.2d 339, 343–44 (1984). Prudential, however, does not explain how these cases are relevant. There was no hint of fraud raised in any of the pleadings, nor any indication of *mutual* mistake. At most, Prudential has shown that it was the victim of a unilateral mistake or, more bluntly, sloppy lawyering. That Prudential's various lawyers were too busy, Brief of Appellees at 4, or "thought someone else at Prudential was going to be responsible for following through to obtain the cash and accounts receivable," *id.* at 6, hardly warrants rewriting the contract to give Prudential the benefit of a bargain it never made.

■ Prudential does vigorously wave the flag of ambiguity, suggesting that the agreement is unclear and therefore ought to be "clarified" by means of extrinsic evidence. A contract is not ambiguous, however, " 'merely because the parties disagree as to the meaning of the language employed by them in expressing their agreement.' " *Amos*, 320 S.E.2d at 337 (quoting *Wilson v. Holyfield*, 227 Va. 184, 313 S.E.2d 396, 398 (1984)). Unlike California and other jurisdictions which have followed *Pacific Gas*, the Virginia courts will find an ambiguity only when contractual language can reasonably be understood in more than one way, or refers to two or more things at the same time. *Amos*, 320 S.E.2d at 337; *Renner Plumbing v. Renner*, 225 Va. 508, 303 S.E.2d 894, 898 (1983). Thus, in its strict adherence to the parol evidence rule, the Virginia Supreme Court has expressly rejected California's practice of permitting parties to a contract to introduce extrinsic evidence to show an ambiguity. *See id.* at 338 (" '[p]arol evidence cannot be used to first create an ambiguity and then remove it.' " (quoting *Cohan v. Thurston*, 223 Va. 523, 292 S.E.2d 45, 46 (1982))). Here there is noth-

ing ambiguous about the contract and, under Virginia law, Prudential is not entitled to introduce evidence to show there is.

Nor does the fact that the transaction is complex, and the transactional documents are lengthy, provide a basis for finding an ambiguity. A transaction of this sort—like thousands of other complicated deals closed every year—will necessarily require careful and detailed documentation. As here, negotiations are often lengthy, involve many principals and lawyers, cover a large number of deal points and are embodied in several related documents. The answer to a particular question therefore does not always jump out from the page; rather, a careful review of various interlocking provisions may be required. Were that to constitute ambiguity, no large transaction would be safe from amendment by parol evidence. The test for ambiguity is not complexity, but lack of clarity. Where, as here, the documents provide a reasonably clear path for us to follow in answering the question presented, there is no ambiguity created by the fact that path is somewhat convoluted. These, after all, were sophisticated parties who worked long and hard in hammering out this contract with the aid of many lawyers. It's hardly appropriate for one side now to displace the documents the parties have agreed to by claiming that they are too complex to stand on their own.

Prudential also appears to argue that the term Owner in the Management Agreement is ambiguous, because the Agreement was drafted long before the sale and, therefore, was meant to refer to the then current owner (Prudential), not any subsequent owner. This argument proves far too much. If Owner in the Management Agreement were read to refer only to Prudential, then Prudential would be entitled to *all* monies payable under that agreement, which would mean that it would continue to draw all the profits from the venture, even though it sold the hotel to Wilson Arlington, a ridiculous result.[8]

---

8. In any event, although the Management Agreement was drafted before the sale, it clearly contemplated that Prudential might not always be the Owner. The Management Agreement

provides that the Owner's rights under the agreement are fully assignable: "Owner shall have the right to sell, lease, mortgage, hypothecate or convey the Hotel subject to this Agree-

■ Finally, even had Prudential been able to raise an ambiguity, its opposition to Wilson Arlington's summary judgment motion simply did not present the type of parol evidence that would be admissible to clear up the ambiguity. As described above, Prudential's principal argument is that it intended to prorate cash and receivables all along, but failed to incorporate that understanding into the contract document. Prudential's supporting affidavits make reference to many internal communications among its lawyers and principals, but mention *no* agreement to that effect with anyone on the other side.[9] Unilateral conversations among various individuals representing the same side cannot, of course, constitute the type of unwritten understanding that could serve to modify or clarify even an ambiguous agreement.[10] What Prudential failed to allege is that it had reached any type of agreement, even an oral one, with Wilson Arlington that payments under the Management Agreement would be prorated.[11]

ment or to assign this Agreement, or both, without the approval of Hyatt...." Sec. 13.2. By assigning its rights under the Management Agreement, the previous owner forfeits all benefits it might receive under it: "The terms, provisions, covenants, undertakings, agreements, obligations and conditions of this Agreement shall be binding upon and shall inure to the benefit of the successors in interest and the assigns of the parties hereto...." Sec. 13.3. The term Owner in the Management Agreement thus clearly was meant to refer to whoever was the current owner of the hotel, not necessarily the original owner. If Prudential had wanted to limit Wilson Arlington's rights as Owner under the Management Agreement, it could easily have done so by the terms of the Sale Agreement or by so providing in the separate document titled Assignment and Assumption of Management Agreement, *see* ER at 164–66. It did neither.

**9.** The only mention of any discussions between representatives of Prudential and Wilson Arlington appears in the affidavit of Sharon Freiman, Assistant Regional Counsel for Prudential. *See* CR at 25. In her affidavit, Freiman asserts she told a Wilson Arlington representative that the accounts receivable and cash "were not dealt with in the Agreement of Sale and would be taken care of at or after closing." According to Freiman, she received no response to this comment. It is well established that, when interpreting contracts, courts give no weight to unanswered, unilateral statements of this nature. *See Consolidated Gas Supply Corp. v. F.E.R.C.*, 745 F.2d 281, 289 n. 18 (4th Cir.1984), *cert. denied*, 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985). Moreover, Ms. Freiman's statement only confirms that proration was not part of the Sale Agreement as drafted, but rather a matter to be handled at a later time. Thus, even if Wilson Arlington's representative had consented to Ms. Freiman's statement, this would hardly amount to an agreement to prorate.

**10.** In striking contrast to its presentation in opposition to Wilson Arlington's motion for summary judgment, at trial Prudential's witnesses did allege an oral agreement on this issue with various Wilson Arlington representatives. RT 6/8/88 24:14–26:22. Because we hold that Wilson Arlington was entitled to summary judgment, we need not point out that such evidence would have been insufficient in any case to overcome the clear language of the contract. However, this evidence is worth mention because it points out one of the serious pitfalls of a weakened parol evidence rule: the tendency of witnesses to remember things in a manner that will support their side's theory of the case. If Prudential's representative had in fact concluded an oral side agreement with Wilson Arlington's representatives, it is curious indeed that Prudential made no mention of it in opposition to the summary judgment motion.

Wilson Arlington suggests in its brief that Prudential's witnesses took the denial of the summary judgment motion as "a license to embellish the facts." Brief of Appellants at 17. We are reluctant to take such an uncharitable view of Prudential's witnesses, some of whom are lawyers. Nevertheless, human memory is inherently fallible and often subject to shaping by suggestion and self-interest. This phenomenon is nowhere more pronounced, perhaps, than in the heat of civil litigation. The unexplained difference between the statements of witnesses in their affidavits and their trial testimony two and a half years later is a classic example of one of the major dangers of allowing parties to testify to facts that contradict the written record.

**11.** Prudential also makes an additional argument based on the fact that the original letter agreement between the parties did provide for proration of all relevant amounts, including those to be paid under the Management Agreement. We fail to see the significance of this document. By its terms, the letter agreement was provisional and its terms were not to survive final documentation; it was not included among the documents incorporated into the Sale Agreement, all of which were covered by the integration clause. The most plausible inference one can draw from this discrepancy is that this was one of the many deal points that changed between the time of the original letter agreement and the initial signing.

C. Wilson Arlington raises a number of other issues in its appeal, primarily relating to the conduct of the trial.[12] However, because we hold that the district court should have granted Wilson Arlington's motions for summary judgment, we need not address them. There were no issues of fact to try in this case. The contractual language in question is clear and, under Virginia law, that is all that matters. For now we can rest easy that, at least in the land that gave us so many of our nation's leading thinkers on liberty, individuals still have the right to order their affairs through the use of the written word. *See Travelers Ins. Co. v. Budget Rent-A-Car Systems, Inc.*, 901 F.2d 765, 772 (9th Cir. 1990) (Sneed, J., concurring).[13]

### III

The judgment of the district court is reversed. On remand, the district court shall enter judgment in favor of Wilson Arlington for the full amount due for pre-closing accounts payable, together with interest and costs.

---

**12.** Wilson Arlington also contends, for example, that Prudential's claim for cash and receivables was delinquent under the terms of the Sale Agreement. Section 5B of the agreement provides that "no adjustments ... shall be made later than six months after the Closing Date." ER at 77. Prudential did not make its claim until more than seven months after the March 26, 1985 closing. Thus, Wilson Arlington argues that Prudential's claim is time barred. While this claim appears to have merit, we need not address it, as we hold in favor of Wilson Arlington on other grounds.

We are troubled, however, by Prudential's assertion that Wilson Arlington failed to raise the time-bar issue in the district court. *See* Brief of Appellees at 12. Wilson Arlington clearly *did* raise this issue, many times over. *See* CR at 30, at 18–20; RT 6/7/88, at 95:21–96:1, 97:23–98:18; RT 6/8/88, at 73:24–78:13; RT 6/10/88, at 53:21–55:4, 154:15–155:24. Even though Wilson Arlington thoroughly addressed this point in its reply brief—clearly refuting Prudential's claim

—Prudential's lawyers failed to withdraw this portion of their opening brief by way of letter to the court or during oral argument. In light of the unambiguous state of the record on this issue, Prudential's counsel would have been better advised to correct or clarify their erroneous assertion.

**13.** As we noted in *Travelers*, we are troubled by the frequent practice of insurance companies and other institutional parties to raise arguments that question the significance of the written word. *See* 901 F.2d at 771. As we noted there,

> [w]hile parties are free to argue in good faith whatever position they deem advantageous in a particular case, we doubt that such a myopic litigation strategy contributes to the healthy development of the law or serves the long-term interest of those whose livelihood depends upon certainty and predictability in the enforcement of commercial contracts.

*Id.* (citations omitted).