COLUMBIA CASUALTY COMPANY *v.* JOSEPH
HOOHULI, JR., PATRICK YAMADA, JAMES S. YAMADA,
MINEKO T. YAMADA and SHOICHI NAKAMURA, and
MID-PAC TRUCKING, INC. and UNITED STATES
FIDELITY AND GUARANTY COMPANY.

No. 4551.

JANUARY 22, 1968.

RICHARDSON, C.J., MIZUHA, MARUMOTO,
ABE AND LEVINSON, JJ.

OPINION OF THE COURT BY LEVINSON, J.

Wallace Yamamoto owned a dump truck which he had in-
sured with Appellant United States Fidelity & Guaranty Co.
(hereinafter "U.S.F. & G."). The policy contained the standard
omnibus clause extending coverage of the policy to

> any person or organization legally responsible for the use
> thereof, provided the actual use of the automobile is by the

Named Insured or such spouse or with the permission of either.

The policy covered the truck for "COMMERCIAL" use, defined as "including occasional use for personal, pleasure, family and other business purposes."

Yamamoto leased the truck to appellant, Mid-Pac Trucking, Inc. (hereinafter "Mid-Pac"). The lease was not placed in evidence, but the parties stipulated that "Mid-Pac had full control and authority over this truck on the day of the accident." The trial court found that the lease gave Mid-Pac "full use and control of the truck and legal responsibility for it."

Appellee Joseph Hoohuli had been employed by Mid-Pac to drive a truck for fourteen or fifteen months before the day of the accident. On Saturday, January 9, 1960, he drove the Yamamoto truck to a Mid-Pac work site on Kalanianaole Highway. He remained at the site until 9:30 a.m. Before Hoohuli left, the Mid-Pac employee in charge told him to drive the truck back to the yard and have the shop foreman send out a replacement. As he drove on Waialae Avenue, along the route prescribed by Mid-Pac, toward the yard, some friends drove by the truck and called to him. Hoohuli stopped the truck, and when his friends told him they were going to the beach, he decided to join them in their car. He parked the truck on a side street less than a mile from Waialae Avenue, between Kaimuki and Diamond Head.

They remained at the beach until after sundown. The friends drove Hoohuli back to the truck around 8 p.m., and he then started to return it to the Mid-Pac yard. After driving the truck one or two blocks, Hoohuli noticed that the braking system was losing air pressure and stopped to call a repairman. The truck began rolling down a hill, and he jumped back into it to try to get it under control. The brakes failed and Hoohuli could not prevent the truck from going onto the sidewalk and running into a house. The appellees Patrick Yamada, James Yamada, Mineko Yamada, and Shoichi Nakamura filed suit against Hoohuli and Mid-Pac for personal injuries and property damage alleged to have been sustained as a result of the accident.

Columbia Casualty Co., an insurance company with a policy

covering Hoohuli's personally owned automobile, brought this action seeking a declaratory judgment that it was not liable either to defend Hoohuli or to pay any judgment rendered against him as a result of the accident. It joined as defendants Hoohuli, U.S.F. & G., Mid-Pac, and the four plaintiffs in the damage action. Mid-Pac and U.S.F. & G. jointly filed a cross-claim and counter-claim for a declaratory judgment that Hoohuli was not operating the truck with the permission of the named insured or owner, that he was not operating the truck within the scope of his employment, and that neither U.S.F. & G. nor Mid-Pac has a duty to pay any judgment which may be rendered against Hoohuli arising out of the accident.

The trial court found that Columbia Casualty was not liable under its policy and granted it judgment accordingly. There was no appeal from that judgment. The trial court found that Hoohuli was not acting within the scope of his employment at the time of the accident. The court also found that Hoohuli was not driving with Mid-Pac's permission since he had been told not to use the truck for pleasure. It did conclude, however, that Hoohuli was driving with Yamamoto's implied permission. There-fore, it concluded that U.S.F. & G. is obligated to defend Hoohuli and pay any judgment rendered against him up to the limits of the Yamamoto policy. From that judgment, Mid-Pac and U.S.F. & G. appealed.

At the outset we must recognize that we are construing a clause in an insurance contract in conjunction with a statute. R.L.H. 1955, § 160-103 (b) requires in part that every liability insurance policy

> [s]hall insure the person named therein and any other person, as insured, using any such motor vehicle or motor vehicles with the express or implied permission of such named insured * * *.

The provision of the statute and the contract clause are not identical. The contract clause provides that "actual use" must be with "permission" whereas the statute provides only that "use" must be with "express or implied permission". If the terms are construed to have different meanings, which for the most part

they have not been, *e.g., Collins* v. *New York Cas. Co.*, 140 W. Va. 1, 13, 82 S.E.2d 288, 296 (1954), the satutory terms take precedence. The policy itself recognizes the priority to be accorded the statute.

25. Terms of Policy Conformed to Statute. Terms of this policy which are in conflict with the statutes of the state wherein this policy is issued are hereby amended to conform to such statutes.

Therefore, we must look to the purposes the statute serves as well as to the intent of the parties to the contract.

U.S.F. & G. can be held liable only if Hoohuli was driving the truck at the time of the accident with the express or implied permission of the named insured, Wallace Yamamoto. Whether Hoohuli was acting within the scope of his employment is not the primary test of omnibus clause coverage. Obviously, in a specific case a named insured-employer may give his employee the use of an automobile with permission co-extensive with the scope of employment. Perhaps in that case the scope of employment, as a matter of fact, will also be the scope of permission, *Hooper* v. *Maryland Cas. Co.*, 233 N.C. 154, 63 S.E.2d 128 (1951).[1] The policy considerations which determine when an employer will be charged with the acts of his employee are completely different from the policy considerations involved in determining whether an employee is covered by the omnibus clause in an insurance contract.[2]

---

[1] As the subsequent discussion will indicate, even this equivalence does not exist in jurisdictions adopting the broad initial permission rule.

[2] The origin of the doctrine of respondeat superior is found in the early right of a slave-owner to substitute a monetary payment rather than give up the slave guilty of injuring another person. Originally, the slave, the offending "thing", was given to the injured party so that the latter might obtain revenge. Holmes, *The Common Law* 16 (1881). From that primitive stage, the law contracted and expanded until it finally reached the state in which we find it today.

What has emerged as the modern justification for vicarious liability is a rule of policy, a deliberate allocation of risk. Prosser, *The Law of Torts* 471 (3d ed. 1964).

Requiring an employer engaged in business to make whole any person injured by his employee acting within the scope of employment merely imposes on that business a basic cost of doing business. This in turn is con-

Cases construing the exact provision in other jurisdictions are legion. Generally, they have been interpreted as falling within one of three categories. One group has been construed as applying a "strict" or "conversion" rule, *e.g., State Farm Mut. Auto. Ins. Co.* v. *Cook,* 186 Va. 658, 43 S.E.2d 863 (1947). This approach requires that the scope of permission include the precise use to which the permittee is putting the automobile at the time of the accident for the permittee to be operating with the named insured's permission. A second group has been construed as applying a "liberal" or "initial permission" rule, *e.g., Matits* v. *Nationwide Mut. Ins.,* 33 N.J. 488, 166 A.2d 345 (1960). Under this approach, if the permittee is given permission to use the car, regardless of express or implied restrictions on his operation, he is covered for any subsequent use short of theft or the like. A third group has been construed as applying a "moderate" or "minor deviation" rule, *e.g., Collins* v. *New York Cas. Co.,* 140 W.Va. 1, 82 S.E.2d 288 (1954). Under this approach, the permittee is covered under the omnibus clause if the use at the time of the accident is no more than a slight deviation from the scope of permission actually given.

As in the case of most legal "rules", the dividing lines between the three often blur. Courts applying the strict rule may disregard "immaterial" deviations, whereas courts applying the initial permission rule sometimes recede in the face of gross deviations contrary to express restriction. In some cases, courts

---

sistent with the basic functioning of our economy which requires that resources be allocated on the basis of the costs normally associated with the enterprise. *See* Calabresi, *Some Thoughts on Risk Distribution and the Law of Torts,* 70 Yale L.J. 499 (1961).

The purpose of expanded insurance coverage through statutory imposition of the omnibus clause is to avoid the loss to innocent parties injured at the hands of otherwise uninsured drivers, Ashlock, *Automobile Liability Insurance: The Omnibus Clause,* 46 Iowa L.Rev. 84, 90 (1960). The high costs to injured parties and to society of uncompensated injuries caused by automobile accidents has been long recognized, Comm. to Study Compensation for Automobile Accidents, *Report to the Columbia University Council for Research in the Social Sciences* (1932); Morris and Paul, *The Financial Impact of Automobile Accidents,* 110 U. Pa. L.Rev. 913 (1962). The desire to avoid these costs has in turn given rise to various proposals to minimize or eliminate them, of which the omnibus clause is only one. Kaye and Breslow, *Legislation to Replace Adjudication—Planned Compensation for Auto Accident Victims,* 35 Bost. U. L.Rev. 488 (1955).

applying the minor deviation rule have moved toward a broad construction of what is "minor" and therefore appear in some cases to apply the initial permission rule. In others, "minor" has been construed so narrowly as to appear to apply the strict rule. *See generally* 5 A.L.R.2d 600 and Supplement. Two courts recently expressing dissatisfaction with this tripartite classification have added a fourth approach, the "major deviation" rule, *Ryan* v. *Western Pac. Ins. Co.*, 242 Ore. 84, 408 P.2d 84 (1965) ; *American Fid. Co.* v. *North Brit. Merc. Ins. Co.*, 124 Vt. 271, 204 A.2d 110 (1964).

Blind adherence to legal rules constitutes an abrogation of the judicial function. Such blind adherence may result as much from adoption of a rule without adequate analysis as from application of a precedent without examination of its claim to validity. Legal rules should result from, rather than be a substitute for, legal analysis. Judicial rumination of ideas in a multitude of factual circumstances gives birth to rules. And continued rumination insures that such rules will be applied only as long as they serve the function for which they were designed. This court is fortunate to have innumerable decisions of other jurisdictions on the precise issue it must decide. They permit the court to view the various approaches already taken and determine which, if any, is most consistent with the purpose of the statutory enactment.[3]

Infrequently will a court be able to resolve an issue by the mere reference to the definition of a word. Nevertheless, there must be a substantial justification for disregarding its generally accepted meaning. If the issue were solely construction of a provision in an insurance contract, we might feel constrained to place a fairly limited meaning on the term "permission". We are, however, construing a statute and therefore must look to the evils which the provision likely would be expected to cure.

By extending coverage, the omnibus clause protects the named

---

[3]"Purpose" is not to be equated with legislative intent. As this court has indicated previously, *Yoshizaki* v. *Hilo Hospital*, 50 Haw. 150, 433 P.2d 220 (1967), the concept of "legislative intent" is too often elusive. In this case, the legislative history fails to mention the provision which now is R.L.H. 1955 § 160-103 (b). Both the Senate and House Reports on S.B. 545 focus on a few provisions to the exclusion of most others, Standing Comm. Rep. No. 227, Sen. Journal 1949, Standing Comm. Rep. No. 734, House Journal 1949.

insured, the permittee who may be uninsured otherwise, and the innocent party injured by an otherwise uninsured permittee. Clearly these interests would support the broadest possible construction, the initial permission rule or even complete coverage for anyone driving the car. On the other hand, the legislatively required omnibus clause infringes on the insurer's right to select its risks. The clause shifts to the named insured the right to select additional insureds which the insurer might have declined to cover. Moreover, in selecting the additional insured, the named insured may be unconcerned with the additional insured's "insurability". These reasons would support a relatively narrow construction.

In addition to reconciling the diverse interests stated above, the approach we adopt should permit a high degree of predictability. As a practical matter, the question of insurance coverage is often preliminary to an adjudication of the permittee's liability in the suit for damages. It is undesirable to require an injured person to await the determination of that question in a declaratory judgment action. Further, it is undesirable to require the permittee-defendant to defend the damage action where the insurer may be under a duty to defend and pay any judgment rendered. Finally, it is undesirable to require the insurer to guess whether it will be liable for any judgment rendered against the permittee and therefore defend him where it need not have done so, or fail to defend and be required to pay a judgment it might have been able to avoid by defending the action.

None of the approaches previously described provides absolute certainty. The alleged high degree of certainty which accompanies the strict and initial permission rules turns out to be illusory because of the exceptions which seem to evolve. Nor do we believe it proper to exalt predictability, even if absolutely attainable, over other considerations. In the absence of an absolute rule that the omnibus clause extends coverage to every person driving the insured automobile, doubt will exist.

We conclude that the benefits from extended coverage justifies an expansive interpretation of the omnibus clause. We believe,

however, that the requirement of consent places a limit of reasonableness on this court. Therefore, while we will construe the scope of permission more broadly than under the minor deviation rule, we will not go so far as to construe it so broadly as to adopt the initial permission rule.[4] We adopt the approach enunciated by the Supreme Court of Vermont as follows:

> In other words, with a showing that the vehicle was placed in the hands of the operator by consent, a presumption arises that the particular use to which the vehicle was being put was within the scope of that consent as measured by the law. The overcoming of this presumption requires evidence establishing that consent had been expressly withdrawn prior to the actual use, or that the actual use was so far afield from the purpose of the loan of the vehicle as to amount to, at best, a temporary tortious conversion * * *. *American Fid. Co. v. North Brit. & Merc. Ins. Co.*, 124 Vt. at 275, 204 A.2d at 113 (1964).

The party who would limit the scope of permission must discharge a heavy burden and therefore in most cases coverage will be clear.

Applying this approach to the present case, we conclude that Hoohuli was driving the truck with Yamamoto's implied permission at the time of the accident and therefore was within the coverage afforded by the omnibus clause. The parties have dealt with this case as one involving multiple permittees. The case law in other jurisdictions might justify this approach. Nevertheless, the facts support treating Hoohuli as the first permittee. When Yamamoto leased his truck to Mid-Pac, he could not conceivably have expected the corporation to drive it. He must have contemplated that a Mid-Pac employee would drive the truck and it was to the employee that Yamamoto gave permission. Yamamoto placed no limitation on the use of the truck in leasing it to Mid-Pac. Therefore, the scope of permission was

---

[4]The legislature has not enacted a mandatory insurance statute although it has enacted a comprehensive financial responsibility act, R.L.H. 1955, § 160-1 *et seq.* A more extreme rule might be justified if the legislature were to enact a mandatory insurance law. *See* Mass. Gen. Law ch. 90 § 34A.

equivalent to the scope of coverage of the insurance contract.[5] The insurance contract afforded coverage for occasional pleasure use. Even if the facts would justify the conclusion that Hoohuli was using the truck for pleasure at the time of the accident, that use was within the scope of Yamamoto's implied permission to any Mid-Pac employee assigned to drive the truck. The fact that Mid-Pac chose to limit the employee's use of the truck does not affect the broad permission impliedly granted by Yamamoto. U.S.F. & G. failed to prove that Yamamoto withdrew permission or in any way limited the permission so as to make Hoohuli's use amount to a tortious conversion.

The result would be the same if we were to treat Hoohuli as a second permittee. Yamamoto gave Mid-Pac complete dominion over the truck. Since Mid-Pac was a corporation, Yamamoto must be presumed to have given it permission to designate additional permittees to drive the truck. Normally a second permittee is limited not only by the scope of permission from the named insured to the first permittee, but also may be limited by a narrower scope of permission from the first permittee to him. In this case, Mid-Pac chose to narrow the scope of permission it received from Yamamoto by prohibiting Hoohuli from using the truck for pleasure.

There is substantial evidence to support the trial court's finding that Hoohuli violated the specific orders of his employer in failing to return the truck to the yard in the morning. Nevertheless, there is insufficient evidence to conclude that Mid-Pac had withdrawn permission to drive. Under the facts of this case, it seems fair to conclude that Mid-Pac would have preferred Hoohuli to drive the truck to the yard even at 8 p.m. rather than leave it on the street. This is especially true since there was no way of locking the door to the truck or the ignition. Nor did the evidence establish such a gross deviation as to approach a tortious conversion. Hoohuli did not use the truck to drive to the beach or to perform some personal errand. He merely

---

[5]Although the named insured may extend coverage to additional persons, he may not broaden the scope of coverage, *Crompton* v. *Lumbermens Mut. Cas. Co.*, 333 Mass. 160, 129 N.E.2d 139 (1955).

drove the truck off the main road and parked it before going on a personal excursion. The substantial time between parking the truck and his return is insufficient to establish the requisite gross deviation. Therefore, U.S.F. & G. has failed to introduce sufficient evidence to negate the presumption that Hoohuli was driving within the scope of permission at the time of the accident.

Judgment affirmed.

*Morris P. Skinner* (*Skinner, Bennett & Ornelles* of counsel) for defendants-appellants.

*Dennis E. W. O'Connor* (*Robertson, Castle & Anthony* of counsel) for defendants-appellees.