915 P.2d 1336

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Plaintiff–Appellant/Cross–Appellee,**

v.

**GTE HAWAIIAN TELEPHONE COMPANY, INC., Argonaut Insurance Company, Defendants–Appellees/Cross–Appellants,**

and

George D. Survant, Defendant–Appellee.

No. 17936.

Supreme Court of Hawai'i.

April 30, 1996.

Carleton B. Reid and John T. Hassler of Reid, Richards, & Miyagi, on the briefs, Honolulu, for plaintiff-appellant State Farm Mutual Auto. Ins. Co.

Jeffrey S. Portnoy and Peter W. Olson of Cades, Schutte, Fleming & Wright, on the briefs, Honolulu, for defendants-appellees GTE Hawaiian Telephone Company, Inc. and Argonaut Insurance Co.

Before MOON, C.J., LEVINSON, NAKAYAMA and RAMIL, JJ., and WEIL, Circuit Judge, in place of KLEIN, J., recused.

MOON, Chief Justice.

In this action for declaratory relief seeking a judicial determination of the rights and responsibilities under two contracts for automobile liability insurance, plaintiff-appellant State Farm Mutual Automobile Insurance Company (State Farm) appeals from the First Circuit Court's judgment, findings of fact (FOF) and conclusions of law (COL), entered after a bench trial on stipulated facts and exhibits, in favor of defendants-appellees GTE Hawaiian Telephone Company, Inc. (GTE), Argonaut Insurance Company (Argo-naut) and George D. Survant. State Farm raises five arguments on appeal: (1) Argonaut is estopped from raising defenses to coverage under the holding of this court's decision in *Sentinel Insurance Co., Ltd. v. First Insurance Co. of Hawai'i, Ltd.*, 76 Hawai'i 277, 875 P.2d 894 (1994); (2) the trial court erred in concluding that Survant was not a permissive user of the vehicle involved in the accident and, therefore, was not entitled to coverage under a policy of insurance written by Argonaut, wherein GTE was the named insured; (3) Argonaut's policy affords primary coverage for vehicles owned by GTE; (4) State Farm is entitled to reimbursement from Argonaut for settlement costs, attorneys' fees, and other expenses related to the underlying tort action; and (5) State Farm is entitled to its fees and costs incurred while pursuing this action for declaratory relief.

For the following reasons, we affirm the trial court's judgment entered in favor of GTE and Argonaut, albeit for different reasons than those employed by the trial court.

## I. BACKGROUND

The stipulated facts that form the basis of the instant action are in pertinent part as follows: On Friday, November 13, 1987, at approximately 12:05 a.m., Survant, a GTE employee, was involved in a motor vehicle accident near the intersection of Waokanaka Place and Pali Highway. While traveling in a northbound direction on Pali Highway, allegedly to avoid someone on a bicycle or moped, Survant crossed the center line and collided head-on with a vehicle driven by Charles T. Aoki. Aoki's friend, Carianne Chang, was a passenger in Aoki's vehicle. Both Aoki and Chang were injured as a result of the collision.

At the time of the accident, Survant was employed as GTE's Building Fleet and Energy Manager as well as its Acting Director of Supply and Transportation. The vehicle that Survant was driving at the time of the accident, a 1985 Nissan station wagon (the company vehicle), was owned by GTE and insured by Argonaut.[1] The parties dispute

---

**1.** The relevant portions of the Argonaut policy provide:

whether, at the time of the accident, Survant was operating the vehicle with GTE's permission. The Argonaut policy applicable to the company vehicle had a $100,000 limit for bodily injury liability.

At the time of the accident, GTE had at least two written regulations pertaining to the use of company vehicles. The regulations were disseminated to GTE employees. GTE's General Instruction No. 230.003 (as amended in 1979) provides in pertinent part:

## USE OF COMPANY VEHICLES

### 2. GENERAL REGULATIONS

(for all employees)

2.01 All employees will be expected to observe the following regulations:

1. Must have proper authorization to use a company vehicle (see Sections 3 and 4) and have a valid driver's license.

. . . .

3. Must observe safe driving principles as defined in the Company Safety Manual.

4. *Must use the vehicle on company business only. The vehicle is not to be used for personal errands;* to transport food, supplies, or employees for group luncheons; etc[.]

### 3. USE BY MANAGEMENT EMPLOYEES

3.01 Department heads may grant standing approval to certain management employees for use of specific company vehicle or pool cars during working hours (copy to motor pool attendant if for pool use).

3.02 *An employee not having standing approval must obtain approval from his department head or authorized management personnel each time he needs a company vehicle during working hours.*

3.03 Use of company vehicles outside of regular working hours is subject to the following regulations:

. . . .

2. Standing approval may be granted to certain "call out" supervisors who are regularly called out after normal working hours due to the critical nature of their work. *This approval can only be granted by the department head with the concurrence of his respective officer. This approval must be submitted in writing to the Supply and Transportation Director.*

. . . .

### 6. USE OF VEHICLES DURING EMERGENCIES

6.01 During emergencies, such as a severe equipment outage or when a critical installation must be cutover without delay, a department head may grant an employee the overnight use of a pool car. Under these conditions, the department head must submit his approval by phone to the Supply & Transportation Director, or his designee. The Supply & Transportation Director will authorize the Motor Pool Attendant to release a vehicle to the employee under these conditions.

6.02 The employee granted such use of a pool car *will not use the vehicle for any purpose other than official business which includes the trip from the site of the emergency to the employee's home, and back to the motor pool.*

6.03 In granting approval under these conditions, the department head will first *consider the feasibility of having the employee report to the job site using his*

**PART VI.—LIABILITY INSURANCE**
**A. WE WILL PAY.**
 1. **We** will pay all sums the **insured** legally must pay as damages because of **bodily injury** or **property damage** to which this insurance applies, caused by an **accident** and resulting from the ownership, maintenance or use of a covered **auto.**
 . . . .
**D. WHO IS INSURED.**
 1. **You** [GTE] are an **insured** for any covered **auto.**

 2. Anyone else is an **insured** while using with **your** [GTE's] permission a covered **auto you** own, hire, or borrow. . . .
**PART VI—CONDITIONS**
**B. OTHER INSURANCE.**
 1. For any covered **auto you** own this policy provides primary insurance. For any covered **auto you** don't own, the insurance provided by this policy is excess over any other collectible insurance. . . .
(Bold emphases in original.)

*personal vehicle,* and the availability of public transportation.

(Emphases added.)

In addition, GTE's General Instruction No. 714.004 (1987) provided in pertinent part:

COMPANY AUTOMOBILE ASSIGNMENT AND EXPENSES

1. *GENERAL*

1.01 The Company-provided automobile **assigned to an individual employee** is primarily intended for the business use by the employee to whom it is assigned, the personal use of the assigned automobile by the employee or a licensed driver in the immediate family is allowed.

1.02 Personal mileage or personal use, except for the use of vehicles as described in paragraphs 1.03.a and 1.03.b, is defined to include all miles driven while not on Company business and includes those miles driven between home and office each day.

1.03 **Personal use of all other Company-provided automobiles is strictly prohibited,** including automobiles used as follows:

　　a. Automobiles removed from premises as a condition of employment where the employee is on bonafide standby (the availability of an employee to respond at any time to a radio dispatch or similar call).

　　b. Automobiles removed from premises for the convenience of the Company because secure garage facilities are not available at or near Company premises (e.g., the danger of vandalism in the case of a vehicle parked overnight at a construction site).

2. *ASSIGNMENT OF COMPANY-PROVIDED AUTOMOBILES*

2.01 No one will be assigned a Company-provided automobile **without the President's written approval.**

(Underline emphases in original and bold emphases added). The company vehicle involved in the accident at issue was assigned to Survant in his capacity as Acting Director of Supply and Transportation, but was not assigned to Survant personally.

GTE also had in force, at the time of the accident, a Code of Business Conduct, applicable to all GTE employees, which provided in pertinent part:

*Employees shall not misuse,* loan, give, sell, destroy, waste, or dispose of *Company vehicles,* equipment, supplies, tools or other property; or services of any value without authorization, and they must be able to account for all property and services, etc., in accordance with instructions. *Any other use must be on specific authorization of a supervisor or higher level of management. All supervisors have the additional responsibility for enforcing Company regulations and policies covering the purchase, disbursement, installation, use, loan, storage, and recovery of all Company properties and of exercising prudent judgment in the absence of specific rules and instructions.*

. . . .

*Use of alcoholic beverages* or use or possession of any narcotic, hallucinogen, depressant, stimulant, or marijuana by employees on or *in Company property* or while working on the job at any time *is not permitted,* and evidence of such conduct may result in disciplinary action.

(Emphases added.) Survant acknowledged receipt of the Code of Business Conduct as recently as April 30, 1986.

After his normal work day on Thursday, November 12, 1987, Survant drove to Henry Loui's Restaurant in the company vehicle. Survant left his office at GTE's Moanalua baseyard on Kikoweana Place between 5:00 and 5:30 p.m. and drove directly to the restaurant, which is located at 2850 Paa Street. Survant met two GTE co-employees, William Holt and Harold Fukumoto, and a friend of Fukumoto's, at the restaurant. During the course of the evening, the four men consumed appetizers and alcoholic beverages. In his deposition, Survant testified that he was drinking bourbon at the restaurant, but could not specifically recall how many drinks he had, although he did recall that he had more than one drink. Survant could not say with certainty that he had less than ten drinks. Fukumoto and his friend left the restaurant between 8:00 and 9:00 p.m. Holt

and Survant stayed at the restaurant until approximately 11:30 p.m. Survant was on his way home to Kailua in the company vehicle when the accident occurred.

After the accident, Survant was transported to St. Francis Medical Center and was treated in the Emergency Room by John Walczak, M.D. Dr. Walczak ordered that a blood alcohol level be obtained on Survant. According to the laboratory report, Survant's blood alcohol level was 226 milligrams per deciliter (mg/dl).

Following the accident, Argonaut paid no-fault benefits to Survant, in the amount of $3,756.17 between February 2, 1988, and April 20, 1988. In addition, on October 5, 1988, Argonaut paid $4,543.39 to State Farm, as Aoki's subrogee, for the collision damage sustained by Aoki's vehicle in the November 13 accident. Argonaut also paid for the collision damages to the GTE vehicle.

On December 22, 1988, Aoki filed suit, which was docketed in the First Circuit Court as Civil No. 88-3937-12 [hereinafter, the *Aoki* suit], for the injuries he sustained in the accident, naming Survant and GTE as defendants.

On February 21, 1989, L. Russell Mitten, Vice-President-General Counsel & Secretary of GTE, forwarded an interoffice memorandum to Survant, advising him that, based upon GTE's investigation of the accident, GTE would deny any liability associated with the accident and that GTE would not defend his interests against the *Aoki* suit. The memorandum provided in pertinent part:

> The claims upon which the [*Aoki*] lawsuit is based arise out of the motor vehicle accident that you [Survant] were involved in on November 13, 1987. Although you were driving a company vehicle at the time of the accident, our investigation indicates that your actions prior to and at the time of the accident were beyond the scope of your employment responsibilities. Consequently, GTE Hawaiian Tel intends to deny liability for the accident. This defense creates an obvious and fundamental conflict between your interests and those of the company, thereby making a joint defense in this case impossible.
>
> Therefore, this memorandum serves to advise that you will be required to assume full responsibility for the defense of your interests against the lawsuit filed by Mr. Aoki. You should make arrangements to retain your own counsel and you will be solely responsible for all costs associated with your defense. If you have personal liability insurance, I suggest you contact your insurance carrier regarding the provisions of you[r] policy related to your legal representation in this matter.

Thereafter, Survant contacted his own personal automobile liability insurance carrier, State Farm, to defend him against the *Aoki* suit.[2] State Farm agreed to defend Survant in the *Aoki* suit under a reservation of rights. State Farm paid all legal fees and costs

---

**2.** The relevant provisions of Survant's automobile insurance policy with State Farm provide:

**Insured**—means the **person, persons** or organization defined as **insureds** in the specific coverage.
**Your car** means the **car** or the vehicle described on the declarations page.
....
**SECTION I—LIABILITY—COVERAGE A**
....
We will:
1. pay damages which an **insured** becomes legally liable to pay because of:
 a. bodily injury to others, and
 b. damage to or destruction of property including loss of its use,
caused by an accident resulting from the ownership, maintenance or use of **your car** and

2. defend any suit against an **insured** for such damages with attorneys hired and paid by us. We will not defend any suit after we have paid the applicable limit of our liability for the accident which is the basis of the lawsuit.
....
**Coverage for the Use of Other Cars**
The liability coverage extends to the use, by an **insured**, of a **newly acquired car**, a **temporary substitute car** or a **non-owned car.**
....
**If There Is Other Liability Coverage**
3. Temporary Substitute Car, Non-Owned Car, Trailer.
If a **temporary substitute car**, a **non-owned car** or a trailer designed for use with a **private passenger car** or **utility vehicle** has other vehicle liability coverage on it, then this coverage is excess.
(Bold emphases in original.)

incurred in connection with the defense of Survant in the *Aoki* suit.

On or about May 25, 1990, an agreement was reached between State Farm, on behalf of Survant, and Argonaut, on behalf of GTE, to settle the *Aoki* suit for the sum of $90,000. The parties stipulated that the settlement amount was fair and reasonable. Argonaut, on behalf of GTE, and State Farm, on behalf of Survant, each paid $45,000 to settle the case. Survant was notified of the settlement after it had been completed. The settling insurance carriers each reserved the right to seek reimbursement from the other for the settlement and defense costs that each had incurred as a result of the *Aoki* suit.

In connection with the settlement of the *Aoki* case, State Farm's counsel agreed with GTE's counsel that of the $90,000 paid to Aoki, $20,000 of that amount represented the increased value of the case due to potential exposure for punitive damages. However, Survant was never informed of such an agreement and did not authorize or consent to State Farm's counsel's agreement with GTE's counsel.

After the *Aoki* suit was settled, Chang made a claim for her injuries sustained in the November 1987 accident. On or about July 10, 1992, State Farm, on behalf of Survant, and Argonaut, on behalf of GTE, paid Chang the sum of $45,000 to settle her claim. The parties stipulated that the settlement with Chang was fair and reasonable. State Farm and Argonaut each paid $22,500 to settle Chang's claim, again reserving the right to seek reimbursement from the other for the settlement payment.

State Farm paid its counsel the total sum of $9,619.79, and Argonaut paid its counsel the total sum of $14,327.93, for attorneys' fees and costs incurred in defending the *Aoki* suit. Although GTE and Argonaut disputed whether State Farm was entitled to reimbursement for State Farm's counsel's fees and, although State Farm and Survant disputed whether Argonaut was entitled to reimbursement for Argonaut's counsel's fees, the parties stipulated that both State Farm's and Argonaut's counsel's fees were reasonably and necessarily incurred in the defense of the *Aoki* suit.

On August 21, 1990, State Farm initiated this action for declaratory relief against GTE and Argonaut. In its complaint, State Farm sought a declaration that Argonaut had a primary duty to defend and indemnify Survant and sought reimbursement from Argonaut and GTE for its defense costs incurred in the *Aoki* suit and for the portion of the settlement amounts paid by State Farm, prejudgment interest, and attorneys' fees relating to the Aoki and Chang claims. On September 13, 1990, GTE and Argonaut answered and counterclaimed, seeking a declaration from the court that Survant was not a permissive user of the company vehicle; GTE and Argonaut also sought reimbursement from State Farm for the portion of the settlement payments made by GTE and Argonaut, prejudgment interest, and attorneys' fees relating to the Aoki and Chang claims.

Thereafter, State Farm filed a motion for partial summary judgment on the issue whether Argonaut breached its duty to defend Survant, which the circuit court granted by order filed October 22, 1991. State Farm filed a second motion for partial summary judgment on the issue whether coverage for Survant was primary under the Argonaut policy, which the court denied by order filed October 15, 1992.

The case proceeded to trial in January 1994 on stipulated facts and exhibits and written closing arguments. On February 24, 1994, the trial court issued its FOF, which provided in pertinent part as follows:

6. At the time of the accident GTE Hawaiian Tel had company policies and practices concerning use of company vehicles. A small group of high-ranking employees had company vehicles personally assigned to them. Other employees had a company vehicle assigned to their position. Survant fell into the latter category.

7. Pursuant to company policy, Survant had a company vehicle assigned to him to use for company business during normal business hours. Company policy required that Survant obtain the permission of his immediate supervisor, who at the time of the accident was Lee Toole, to use the

vehicle for other purposes or outside of normal business hours.

8. Survant did not obtain Toole's express permission to take the vehicle home on November 12, 1987.

9. On the date of the accident, Survant was "on call" 24 hours per day, seven days per week in his capacity as GTE's Building Fleet & Energy Manager.

10. At the time of the accident, Survant had access to the vehicle 24 hours per day and had possession of the keys to the vehicle.

11. About the time of the accident, Survant used the vehicle for site inspections, to transport company equipment, or to attend company meetings in Honolulu, where parking was restricted.

12. Before the date of the accident, Survant had driven a GTE owned vehicle home approximately 50 times per year.

13. On November 12, 1987, Survant's personal motor vehicle was in a shop for repair[,] and Survant had a company meeting to attend early the next morning.

14. Survant's failure to obtain Toole's express permission to take the vehicle home on November 12, 1987, may have been technically in violation of company policy; however, based upon the prior established usage and practice of Survant taking a company vehicle home regularly fifty (50) times per year, the company has acquiesced and given implied permission to Survant to take the motor vehicle home, especially when Survant's personal vehicle is disabled for repairs and Survant has a company meeting to attend early the next morning.

15. Survant did have implied permission of GTE Hawaiian Tel to take the company vehicle home on November 12, 1987.

. . . .

20. Survant was severely intoxicated at the time of the accident, the blood alcohol specimen obtained at 1:34 a.m. showed Survant's [blood alcohol content] was 226 milligrams per deciliter (mg./dl.). Survant was not in any mental or physical condition to perform any service for his employe[r]

GTE Hawaiian Tel at the time of the accident.

21. Survant was driving home from Henry Loui's and was not conducting company business and was not acting in the course and scope of his employment with GTE Hawaiian Tel at the time of the accident.

22. At the time of the accident GTE Hawaiian Tel had in effect a Code of Business Conduct. Survant had actual knowledge of the Code and had agreed to comply with its provisions.

23. Among other things, the Code prohibited misuse of company vehicles. The Code also prohibited use of alcoholic beverages on or in company property.

24. Survant's operation of the company vehicle while he was intoxicated was misuse of a company vehicle and, therefore, in violation of the Code. Although there is no evidence Survant actually drank while in the company vehicle, his operation of the vehicle while he was intoxicated also violated the fair inference of the prohibition in the Code against use of alcohol on or in company property. Survant knew that the company policy prohibited driving a company vehicle under the influence of alcohol.

25. Even if Survant had the implied permission of GTE Hawaiian Tel to take the company vehicle home on November 12, his detour to Henry Loui's and subsequent intoxication grossly deviated from the scope of any implied permission to use the company vehicle which may have been impliedly conferred by GTE Hawaiian Tel.

The trial court's COL provided in pertinent part:

2. Argonaut and GTE Hawaiian Tel are not estopped from raising coverage defenses.

3. Survant had the implied permission of GTE Hawaiian Tel to drive the company vehicle to his home and to drive it back to the company meeting the next day.

4. Survant did not have the implied permission of GTE Hawaiian Tel to consume an excessive amount of alcohol and drive the company-owned vehicle in a se-

verely intoxicated condition. Accordingly, Survant was not an "insured" under the omnibus coverage of the Argonaut policy and was not covered at the time of the accident.

5. Because there was no coverage for Survant under the Argonaut policy, Argonaut is entitled to reimbursement from State Farm for the $67,500 it paid to settle the Aoki and Chang claims.

6. Argonaut is also entitled to recover pre-judgment interest from State Farm from the dates of settlement, i.e., June 4, 1990 and July 10, 1992.

7. Under Hawaii law, when two insurers have a concurrent duty to defend, but one insurer refuses to defend, the insurer which provides a defense is entitled to recover half of the defense costs from the other. Accordingly, State Farm is entitled to recover from Argonaut the sum of $4,809.90, which is half of the fees and costs incurred to [State Farm's counsel] for defending Survant.

The trial court entered judgment in accord with the FOF and COL. This timely appeal followed.[3]

## II. STANDARDS OF REVIEW

State Farm takes issue with FOF 24 and 25 and COL 2, 4, 5, 6, and 7. It is well settled that

[w]e review the trial court's COLs de novo under the right/wrong standard. State v. Bowe, 77 Hawai'i 51, 53, 881 P.2d 538, 540 (1994) (citing State v. Furutani, 76 Hawai'i 172, 180, 873 P.2d 51, 59 (1994)). "Under the right/wrong standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." State v. Miller, 4 Haw.App. 603, 606, 671 P.2d 1037, 1040 (1983). See also Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 119, 839 P.2d 10, 28, reconsideration denied, 74 Haw. 650, 843 P.2d 144 (1992). Thus, "[a] COL is not binding upon the appellate court and is freely reviewable for its cor-

rectness." Bowe, 77 Hawai'i at 53, 881 P.2d at 540 (citation omitted).

We review the trial court's FOFs under the clearly erroneous standard. Dan v. State, 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994). Under this standard, "[a] finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed." Id.

State v. Lopez, 78 Hawai'i 433, 440–41, 896 P.2d 889, 896–97 (1995).

## III. DISCUSSION

### A. Argonaut should not be estopped from raising coverage defenses.

State Farm first argues that the trial court erred in concluding that Argonaut was not estopped from raising coverage defenses. State Farm asserts that, because Argonaut was found to be in breach of its duty to defend Survant, Argonaut should be estopped from raising coverage defenses and that an irrebuttable presumption that Argonaut is obligated to indemnify Survant should apply. We disagree. Recently, in Sentinel Insurance Co., Ltd. v. First Insurance Co. of Hawai'i, Ltd., 76 Hawai'i 277, 875 P.2d 894 (1994), we rejected the rule that an insurer's breach of the duty to defend results in an irrebuttable presumption that the insurer is obligated to indemnify its insured. Id. at 296, 875 P.2d at 913. We noted that:

[A] blanket application of coverage by waiver or estoppel, based upon the failure to provide a defense, subverts any meaningful distinction between the duty to defend and the separate duty to indemnify and, in many cases, serves no more than to punish the insurer for breach of a contractual duty.

Sentinel, 76 Hawai'i at 295, 875 P.2d at 912.

Cognizant of our holding in Sentinel, State Farm argues that, because Argonaut's basis for denying Survant a defense and its arguments for denying Survant coverage differ,

---

**3.** GTE also timely cross-appealed the trial court's order granting partial summary judgment in favor of State Farm on the issue of Argonaut's duty to defend, but withdrew the cross-appeal by stipulation filed July 26, 1994.

the application of principles of estoppel nevertheless would be appropriate in the present case. State Farm relies on the following passage from the opinion in *Sentinel:*

> Certainly, in individual cases, the application of waiver or estoppel will be appropriate—for example, where the insured has been prejudiced in some way by the insurer's failure to provide a defense, *see Polaroid [Corp. v. Travelers Indem. Co.,]* 414 Mass. [747,] . . . 764, 610 N.E.2d [912,] . . . 922 [ (1993) ], or where the insurer has taken inconsistent positions with regard to defense and coverage. *See, e.g., Tomerlin v. Canadian Indem. Co.,* 61 Cal.2d 638, 394 P.2d 571, 39 Cal.Rptr. 731 (1964) (insured relinquished personal attorney's representation when agent for insurer represented that insurer was liable for coverage and would abandon reservation of rights).

*Id.* at 296, 875 P.2d at 913.

 Relying on the above-quoted passage, State Farm argues that Argonaut changed its position regarding defense and coverage. State Farm maintains that, in Mitten's February 21, 1989 interoffice memorandum to Survant, the sole reason cited for denying Survant a defense was that Survant was outside the scope of his employment at the time of the accident and that Argonaut now denies coverage on the basis that Survant was not operating the company vehicle with GTE's permission. The flaw in State Farm's reasoning is that, unlike the *Tomerlin* case cited in *Sentinel,* where the insurer took inconsistent positions regarding coverage by essentially admitting coverage yet failing to pay the judgment against the insured, Argonaut has consistently maintained in this case that there was no coverage under its policy for Survant regarding the accident in question. At no time did Argonaut indicate to anyone that it would assume Survant's defense or provide coverage for Survant regarding the accident at issue. As we noted in *Sentinel:*

> [W]e fail to see how there can be an estoppel in a case where the insurer refuses to defend *by taking the position that there is no coverage under the policy* and then maintains that same position in defending the insured's suit for indemnification. In

that situation, "no estoppel is involved in any traditional sense because, in refusing to defend a claim, an insurer makes no representation on which the insured relies to its detriment." *Polaroid,* 414 Mass. at 763, 610 N.E.2d at 922 (citation omitted).

*Id.* at 295, 875 P.2d at 912. As the above-quoted passage makes clear, the "position"—a change from which would merit application of estoppel—refers to an insurer's decision regarding coverage *generally.* Estoppel is particularly appropriate where the insurer, either directly or through an agent, as in *Tomerlin,* admits coverage under a policy of insurance, yet later denies coverage. However, where the insurer maintains the position that it will not defend an insured because there is no coverage under a policy, estoppel should not apply because the insurer has not changed its position regarding whether it would cover its insured, and, therefore, the insured has not relied on any of the insurer's representations to his or her detriment. As we further noted in *Sentinel:*

> Blanket application of coverage by waiver or estoppel, on the contrary, would result in the insured receiving a windfall. The insured would obtain a benefit it did not bargain for where the facts developed in discovery or at trial after the duty to defend has been breached establish[ ] that the insured was not entitled to coverage. As one scholar of insurance has noted:
>
>> Where there is no coverage, the greatest injury that the insured could have suffered by a failure to defend is the cost of defense—the judgment would have been his responsibility regardless.
>>
>> Courts holding to the contrary apparently rel[y] on estoppel and breach of contract. Since the insured was in no way misled there could be no estoppel. A breach of contract of course waives a forfeiture but it does not nor should it create a new contract.
>
> [21 J.] Appleman[, *Insurance Law and Practice,* § 4689,] at 215 n. 13 [ (1980) ].

*Id.* at 295–96, 875 P.2d at 912–13 (brackets and ellipsis points in original omitted).

 Moreover, we have been presented, post-*Sentinel,* with the opportunity to discuss

the principles of estoppel in the automobile insurance context in *AIG Hawai'i Insurance Co. v. Smith,* 78 Hawai'i 174, 891 P.2d 261 (1995). In *Smith,* we noted that absent manifest injustice, "the party invoking equitable estoppel must show that he or she has detrimentally relied on the representation or conduct of the person sought to be estopped, *and* that such reliance was reasonable." *Id.* at 179, 891 P.2d at 266 (emphasis in original and internal quotation marks omitted). In the present case, nowhere does State Farm maintain that it—or Survant—relied on Mitten's letter to its detriment; nor is there any evidence in the record to so indicate. In view of the foregoing, we hold that Argonaut is not estopped from raising coverage defenses in the present case.

**B.** *Survant was not a permissive user of the company vehicle.*

State Farm next argues that the trial court erred in concluding that Survant did not have permission to use the company vehicle and was therefore not an "insured" under the policy issued by Argonaut to GTE. We disagree.

**1. General Principles of Permissive Use**

Pursuant to the "omnibus" clause of the liability insurance section of the Argonaut policy, the definition of "who is insured" provides that "[a]nyone ... is an insured while using with your permission a covered auto you own, hire or borrow[.]" The policy does not otherwise define "permission." As we recently stated in *AIG Hawai'i Insurance Co., Inc. v. Vicente,* 78 Hawai'i 249, 891 P.2d 1041 (1995),

> "insurance policies are governed by statutory requirements in force and effect at the time such policies are written.... Such provisions are read into each policy issued thereunder, and become a part of the contract with full binding effect upon each party." *AIG Hawai'i Ins. Co. v. Caraang,* 74 Haw. 620, 633, 851 P.2d 321, 328 (1993) (quoting *National Union Fire Ins. Co. v. Ferreira,* 71 Haw. 341, 344, 790 P.2d 910, 912 (1990)) (internal quotation marks omitted). Hawai'i Revised Statutes

(HRS) § 431:10C–301(a)(2) (1987 Spec.Pamphlet) provides in pertinent part:

> **Required motor vehicle policy coverage.** (a) In order to meet the requirements of a no-fault policy as provided in this article, an insurance policy covering a motor vehicle shall provide:
>
> . . . .
>
> (2) Insurance to pay on behalf of the owner *or any operator of the insured motor vehicle using the motor vehicle with the express or implied permission of the named insured,* sums which the owner or operator may legally be obligated to pay for injury, death, or damage to property of others ... which arise out of the ownership, operation, maintenance, or use of the motor vehicle[.]

(Emphasis added.) Similarly, HRS § 287–25(2) (1985) provides in pertinent part:

> **Owner's policy requirements.** An owner's policy of liability insurance:
>
> . . . .
>
> (2) Shall insure the person named therein and any other person, as insured, using any such motor vehicle ... *with the express or implied permission of the named insured,* against loss from the liability imposed by law for damages arising out of the ownership, maintenance, or use of the motor vehicle[.]

(Emphasis added.)

*Id.* at 251, 891 P.2d at 1043.

█ Pursuant to the above-stated reasoning and the language of the applicable statutes, Survant therefore would qualify as an "insured" under the Argonaut policy if he was using the company vehicle with either the express or implied permission of GTE. *See* 12 G. Couch, *Cyclopedia of Insurance Law* § 45:350 at 692–93 (2d ed. 1981) [hereinafter, Couch] ("The permission required to bring an additional insured within the protection of an omnibus clause may, as a general proposition, be express or implied, and the omnibus clause may specifically provide, or be required by statute to provide, that the permission of the named insured may be express or implied.").

Couch notes that "[e]xpress permission must be of an affirmative character, directly and distinctly stated, clear and outspoken, and not merely implied or left to inference." Couch, *supra*, § 45:351, at 694. As to implied permission, Couch notes that:

Implied permission may arise as a product of the present or past conduct of the insured, and the relationship between the parties, including the lack of any objection to the use by the permittee, which signifies acquiescence or consent of the insured, and is usually shown by such usage and practice of the parties over a sufficient period of time prior to the day on which the insured car was being used, as would indicate to a reasonable mind that the permittee had the right to assume permission under the particular circumstances.

Otherwise stated, permission to use an automobile need not be given in express words, but may be implied from all the facts and circumstances surrounding the parties, and may result by implication from the relationship of the parties.

Couch, *supra*, § 45:355, at 696–99 (footnotes omitted).

In *Columbia Casualty Co. v. Hoohuli*, 50 Haw. 212, 437 P.2d 99 (1968), this court set out the approach to be applied to permissive use cases in Hawai'i:

[W]ith a showing that the vehicle was placed in the hands of the operator by consent, a presumption arises that the particular use to which the vehicle was being put was within the scope of that consent as measured by the law. The overcoming of this presumption requires evidence establishing that consent had been expressly withdrawn prior to the actual use, or that the actual use was so far afield from the purpose of the loan of the vehicle as to amount to, at best, a temporary tortious conversion.

*Id.* at 219, 437 P.2d at 105 (quoting *American Fidelity Co. v. North Brit. & Merc. Ins. Co.*, 124 Vt. 271, 204 A.2d 110, 113 (1964)). The *Hoohuli* decision went on to describe the term "temporary tortious conversion" as being a "gross deviation" from the scope of permission afforded upon the putative per-

mittee. *Hoohuli*, 50 Haw. at 220, 437 P.2d at 106.

2. **Survant did not have GTE's express or implied permission to drive the company vehicle on the night of the accident.**

a. *express permission*

■ A review of the record indicates, pursuant to the foregoing standard, that Survant did not have GTE's express permission to drive the company vehicle on the night of the accident. As the trial court accurately noted in its FOF 6, "[a]t the time of the accident GTE Hawaiian Tel had company policies and practices concerning use of company vehicles. A small group of high-ranking employees had company vehicles personally assigned to them. Other employees had a company vehicle assigned to their position. Survant fell into the latter category."

Although Survant had GTE's express permission to drive the company vehicle in that the company vehicle was assigned to his position, the scope of that express permission was limited by the pertinent provisions of GTE's General Instructions, as previously delineated, regarding the use of GTE-owned vehicles. As our review of the record indicates, and the trial court's FOF 7 accurately notes,

[p]ursuant to company policy, Survant had a company vehicle assigned to him to use for company business during normal business hours. Company policy required that Survant obtain the permission of his immediate supervisor, who at the time of the accident was Lee Toole, to use the vehicle for other purposes or outside of normal business hours.

A review of the record further reveals, and as FOF 8 accurately states, "Survant did not obtain Toole's express permission to take the vehicle home on November 12, 1987." Therefore, because: (1) the scope of GTE's express permission to drive a GTE-owned vehicle was prescribed in part by GTE's General Instructions; (2) GTE's General Instruction No. 230.003, § 3.02 required Survant to obtain his superior's permission to use a GTE-owned vehicle for personal use or outside of business hours; and (3) Survant did

not obtain his superior's permission to drive the company vehicle on the night of the accident, we hold that Survant was not driving the company vehicle with GTE's express permission at the time of the accident.

### b. *implied permission*

■ The dispositive issue, therefore, is whether Survant had GTE's implied permission to drive the company vehicle on the night of the accident. As previously noted, the trial court held that, based on the fact that Survant had taken the company vehicle home approximately fifty times in the past, Survant had GTE's implied permission to drive the company vehicle home on the night of the accident. Pursuant to *Hoohuli*, however, the trial court held that, although Survant may have had GTE's implied permission to take the company vehicle home outside of business hours, Survant "grossly deviated" from the scope of GTE's implied permission by driving the company vehicle to Henry Loui's Restaurant, consuming alcoholic beverages in a quantity sufficient to result in a blood alcohol level of 226 mg/dl, and then driving home.

GTE argues that the trial court correctly applied the test set out in *Hoohuli* in finding that Survant's conduct constituted a "gross deviation" from the scope of permission afforded Survant. State Farm, on the other hand, argues that the trial court erred in so finding. We disagree with both arguments.

Speaking specifically to the employer-employee context, where an employee is involved in an automobile accident while driving a vehicle owned by his or her employer, Couch notes that "consent [from the employer to the employee] must be shown by the acts and conduct of both parties, employer as well as employee[,]" and, although "[u]nder some circumstances, . . . even silence may be sufficient to show an implied permission for the insured's employee to use the employer's vehicle[,] . . . [b]y hypothesis[,] no implied permission can arise merely because an employee obtains possession of the car without the knowledge of the named insured." Couch, *supra*, § 45.355, at 703–704 (footnotes omitted). This court has recognized this

principle previously in *Vicente*, where we noted that:

It is undisputed that Aida [the first permittee] expressly allowed Bateman [the second permittee and putative insured] to drive the insured vehicle. It is also undisputed that: (1) *Corpuz [the named insured] did not know Bateman was driving the insured vehicle;* (2) there is no evidence of any relationship between Corpuz and Bateman; and (3) *there is no evidence of any conduct on the part of Corpuz indicating consent or acquiescence to anyone's use of the insured vehicle other than Aida.*

*In the absence of any affirmative evidence indicating Corpuz impliedly permitted Bateman to drive the insured vehicle,* we examine whether, as a matter of law, the scope of permission conferred upon Aida by Corpuz included the ability to permit others to drive the insured vehicle[.]

78 Hawai'i at 252, 891 P.2d at 1044 (emphases added).

■ This principle has also been well established in jurisdictions that have had occasion to address the issue. *See, e.g., Cooper v. Firemen's Fund Ins. Co.*, 252 S.C. 629, 167 S.E.2d 745, 747 (1969) ("Implied consent, as the term suggests, rests upon proof of circumstances from which an inference of actual permission or consent reasonably arises. The implication is one of fact based upon circumstantial evidence. Implied consent involves an inference arising from a course of conduct or relationship between the parties, in which there is mutual acquiescence or lack of objection under circumstances signifying assent. However, permission requires something more than mere sufferance or tolerance without taking steps to prevent the use of the automobile and *permission cannot be implied from possession and use of the automobile without the knowledge of the named insured.*" (Citation omitted and emphasis added.)); *Bourne v. Manley*, 435 S.W.2d 420, 427 (Mo.Ct.App.1968) ("We immediately recognize that one relying upon implied permission must prove it [and] that *no implied permission arises merely because someone obtains possession of a vehicle and uses it*

*without the knowledge of the named insured* [.]" (Footnotes omitted and emphasis added.)); *Brochu v. Taylor,* 223 Wis. 90, 269 N.W. 711, 715 (1936) ("In order to support an inference that one has the implied permission to use an automobile belonging to another, for his [or her] own pleasure and purposes, there must be evidence tending to show a course of conduct or practice *known to the owner* and acquiesced in by him [or her], or by some one having authority to give permission." (Citation omitted and emphasis added.)); *Tomasetti v. Maryland Casualty Co.,* 117 Conn. 505, 169 A. 54, 55 (1933) ("If it was found that use of [the named insured's] car by [the putative permittee] . . . had been . . . without [the named insured's] knowledge, permission of the required nature would not be established; but when, as here, it is found that such prolonged, frequent, and habitual use was with knowledge and acquiescence of the owner, it must be regarded as amounting to an authorization and a permission within the policy."). *See also* J. Appleman, *Insurance Law and Practice,* § 4365 (R. Buckley, ed. 1979 and Supp.1994), at 184–86 ("[I]mplied permission is usually shown by usage and practice of the parties over a period of time preceding the day upon which the insured automobile was being used, *assuming, of course, that all parties had knowledge of the facts.*" (Footnotes omitted and emphasis added.)).

As a threshold matter, therefore, phrased in the context set out by our decision in *Hoohuli,* before the court determines whether the presumption of permission set out in *Hoohuli* applies, there must be a "showing that the vehicle was placed in hands of the operator by consent." 50 Haw. at 219, 437 P.2d at 105 (citation omitted). In other words, if, as the trial court in the present case found, "consent" exists in a putative insured by acquiescence, no *Hoohuli* presumption may apply prior to the admission of evidence establishing that the named insured *knew* about the putative insured's use of the insured vehicle.

A review of the record in this case indicates that no evidence was presented establishing that GTE had knowledge that Survant had taken the company vehicle home fifty times per year in the past. Survant's supervisor, Lee Toole, was not deposed; nor was any other evidence admitted indicating that GTE *knowingly* acquiesced in Survant's taking the company vehicle home. It is well established that the person seeking to hold the insurer liable on the basis of the omnibus clause has the burden of proving the existence of the permission necessary under that clause. *See, e.g., Derusha v. Iowa Nat. Mut. Ins. Co.,* 49 Wis.2d 220, 181 N.W.2d 481 (1970); *Allstate Ins. Co. v. Federated Mut. Implement & Ins. Co.,* 251 S.C. 203, 161 S.E.2d 240 (1968); *Devall v. State Farm Mut. Ins. Co.,* 249 So.2d 282 (La.Ct.App. 1971). Therefore, in the absence of evidence, the "person seeking to hold the insurer liable on the basis of the omnibus clause," in this case State Farm, must be considered to have failed to meet its burden of proving permissive use, and we, therefore, hold that the trial court erred in finding and concluding that Survant possessed GTE's implied permission to operate the company vehicle.

However, even though the trial court may have erred in concluding that Survant initially possessed GTE's implied permission to operate the company vehicle on the night of the accident, we hold that the trial court ultimately reached the correct result regarding permissive use, albeit by different reasoning, by concluding that Survant did not have GTE's permission to drive the company vehicle at the time of the accident. Consequently, we need not reach State Farm's arguments regarding primary and secondary coverage and attorneys' fees.

## IV. CONCLUSION

For the foregoing reasons, the judgment filed March 9, 1994, in favor of GTE and Argonaut, is affirmed.